# United States Court of Appeals
## For the First Circuit

No. 19-1746

DAVID CARSON, as parent and next friend of O.C.; AMY CARSON, as parent and next friend of O.C.; ALAN GILLIS, as parent and next friend of I.G.; JUDITH GILLIS, as parent and next friend of I.G.; TROY NELSON, as parent and next friend of A.N. and R.N.; ANGELA NELSON, as parent and next friend of A.N. and R.N.,

Plaintiffs, Appellants,

v.

A. PENDER MAKIN, in her official capacity as Commissioner of the Maine Department of Education,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. D. Brock Hornby, U.S. District Judge]

Before

Barron, Circuit Judge,
Souter,[*] Associate Justice,
and Selya, Circuit Judge.

Timothy D. Keller, with whom Arif Panju, Institute for Justice, Lea Patterson, First Liberty Institute, Jeffrey T. Edwards, PretiFlaherty, Michael K. Whitehead, Jonathan R. Whitehead, and Whitehead Law Firm, LLC, were on brief, for appellants.

Vivek Suri, Assistant to the Solicitor General, with whom

---

[*] Hon. David H. Souter, Associate Justice (Ret.) of the Supreme Court of the United States, sitting by designation.

Eric S. Dreiband, Assistant Attorney General, Halsey B. Frank, United States Attorney, Elliott M. Davis, Acting Principal Deputy Assistant Attorney General, Thomas E. Chandler, Attorney, Civil Rights Division, U.S. Department of Justice, and Eric W. Treene, Attorney, Civil Rights Division, U.S. Department of Justice, were on brief, for United States, amicus curiae.

Jay Alan Sekulow on brief for the American Center for Law and Justice, amicus curiae.

Russell Menyhart, Taft Stettinius & Hollister LLP, Leslie Hiner, EdChoice, Joshua D. Dunlap, and Pierce Atwood LLP on brief for EdChoice and Maine Heritage Policy Center, amici curiae.

Stephen C. Whiting, The Whiting Law Firm, and Mordechai Biser on brief for Agudath Israel of America, amicus curiae.

Sarah A. Forster, Assistant Attorney General, with whom Aaron M. Frey, Attorney General, Susan P. Herman, Deputy Attorney General, and Christopher C. Taub, Assistant Attorney General, were on brief, for appellee.

Zachary L. Heiden, Emma E. Bond, Daniel Mach, Heather L. Weaver, Richard B. Katskee, Alex J. Luchenitser, Sarah R. Goetz, M. Freeman, and David L. Barkey on brief for American Civil Liberties Union, American Civil Liberties Union of Maine Foundation, Americans United for Separation of Church and State, ADL (Anti-Defamation League), Central Conference of American Rabbis, Hindu American Foundation, Interfaith Alliance Foundation, Men of Reform Judaism, National Council of Jewish Women, People for the American Way Foundation, the Reconstructionist Rabbinical Association, Union for Reform Judaism, Women of Reform Judaism, American Atheists, Inc., Susan Marcus, James Torbert, and Theta Torbert, amici curiae.

Bruce W. Smith, Malina E. Dumas, and Drummond Woodsum on brief for Maine School Boards Association and Maine School Superintendents Association, amici curiae.

Francisco M. Negrón, Jr., John Foskett, and Valerio, Dominello & Hillman LLC on brief for National School Boards Association, Maine School Boards Association, Massachusetts Association of School Committees, New Hampshire School Boards Association, and Rhode Island Association of School Committees, amici curiae.

Samuel Boyd, Christine Bischoff, Lindsey Rubinstein, Southern Poverty Law Center, David G. Sciarra, Jessica Levin, Wendy Lecker, and Education Law Center on brief for Public Funds Public Schools, amicus curiae.

Alice O'Brien, Eric Harrington, Kristen Hollar, Judith Rivlin, Jennifer Mathis, Jennifer Reisch, Paul D. Castillo, Andrew T. Mason, and Sunu Chandy on brief for National Education Association; American Federation of State, County and Municipal Employees, AFL-CIO; Bazelon Center for Mental Health Law; Center

for Law and Education; Council of Administrators of Special Education; Equal Rights Advocates; GLSEN; Lambda Legal Defense and Education Fund, Inc.; Maine Education Association; National Women's Law Center; and Southern Education Foundation, amici curiae.

Samuel T. Grover, Patrick Elliott, Andrew Seidel, and Brendan Johnson on brief for Freedom from Religion Foundation, Inc., amicus curiae.

October 29, 2020

BARRON, **Circuit Judge**.  The   Maine   Constitution instructs the state legislature "to require[] the several towns to make suitable provision, at their own expense, for the support and maintenance of public schools."  Me. Const. art. VIII, pt. 1, § 1. In response, the legislature passed a statute that obliges it to "enact the laws that are necessary to assure that all school administrative units make suitable provisions for the support and maintenance of the public schools" so that every school-age child in the state has "an opportunity to receive the benefits of a free public education."  Me. Stat. tit. 20-A, § 2(1).

Maine faces a practical problem, however, in making good on this commitment: more than half of its 260 school administrative units ("SAUs") do not operate a public secondary school of their own.  So, to ensure that those SAUs make the benefits of a free public education available no less than others do, Maine provides by statute that they may either (1) contract with a secondary school -- whether a public school in a nearby SAU or an "approved" private school -- for school privileges, id. §§ 2701-2702, 5204(3), or (2) "pay the tuition . . . at the public school or the approved private school of the parent's choice at which the student [from their SAU] is accepted," id. § 5204(4).

In this appeal, we consider a suit concerning this tuition assistance program that three sets of parents (and their children, for whom they sue as next friends) brought in 2018

- 4 -

against the Commissioner ("Commissioner") of the Maine Department of Education ("Department").  The suit, which the plaintiffs filed in the District of Maine, takes aim at the program's requirement that a private school must be "a nonsectarian school in accordance with the First Amendment of the United States Constitution" to qualify as "approved" to receive tuition assistance payments, see Me. Stat. tit. 20-A, § 2951(2).  The plaintiffs claim that this "nonsectarian" requirement infringes various of their federal constitutional rights, including their First Amendment right to the free exercise of religion, by barring them from using their SAUs' tuition assistance to send their children to religious schools.

We have twice before rejected similar federal constitutional challenges to the "nonsectarian" requirement, see Eulitt ex rel. Eulitt v. Me. Dep't of Educ., 386 F.3d 344 (1st Cir. 2004); Strout v. Albanese, 178 F.3d 57 (1st Cir. 1999), but, in the interim, the Supreme Court of the United States has decided two cases that the plaintiffs contend require us now to reverse course.  Even accounting for that fresh precedent, however, we see no reason to do so.  We thus affirm the District Court's grant of judgment to the Commissioner.

## I.

### A.

The plaintiffs are David and Amy Carson and their daughter O.C., for whom they sue as next friends; Alan and Judith Gillis and their daughter I.G., for whom they sue as next friends; and Troy and Angela Nelson and their children A.N. and R.N., for whom they sue as next friends. The plaintiffs live in SAUs that operate no public secondary school of their own and that have opted to provide tuition assistance to parents who wish to send their children to an "approved" private school.

On August 21, 2018, the plaintiffs filed a complaint in the District of Maine, alleging that § 2951(2)'s "nonsectarian" requirement -- which the complaint refers to as the "sectarian exclusion" -- violates the federal Constitution both on its face and as applied because it "denies sectarian options to tuition-eligible students and their parents." The complaint asserts claims pursuant to 42 U.S.C. § 1983 based on alleged violations of the United States Constitution under the Free Exercise, Establishment, and Freedom of Speech Clauses of the First Amendment, as they have been incorporated by the Fourteenth Amendment's Due Process Clause, and under that Amendment's Equal Protection Clause. The complaint requests declaratory and injunctive relief. When filed, it named as the defendant Robert G. Hasson, Jr., in his official capacity as Commissioner.

**B.**

The tuition assistance program works as follows. Parents first select the school they wish their child to attend. See Me. Stat. tit. 20-A, § 5204(4). If they select a private school, and it has been "approved" by the Department under § 5204, the parents' SAU must pay the child's tuition costs up to the legal tuition rate established in § 5806 by making the tuition payments directly to the school, see id. §§ 2951, 5204(4), 5806(2).

To be "approved" to receive such payments, a private school must meet the requirements for basic school approval -- and thus the state's compulsory school attendance requirements. Id. §§ 2901, 2951, 5001-A. To meet those requirements, the school must be either "accredited by a New England association of schools and colleges" or "approv[ed] for attendance purposes" by the Department, which depends in part on whether the school can show that it meets basic curricular requirements. Id. §§ 2901-2902. In addition, a private school must be "nonsectarian in accordance with the First Amendment" and comply with certain separate reporting and auditing requirements. Id. § 2951(2), (5).

**C.**

The complaint sets forth detailed allegations about the "nonsectarian" requirement's impact on the plaintiffs. Those allegations, which we summarize here, pertain to both the identity of the sectarian schools that the parents want to send their

- 7 -

children to and the way the "nonsectarian" requirement prevents them from receiving tuition assistance to do so.

The Carsons and the Gillises send their respective children to Bangor Christian School ("BCS"), which is a private, nonprofit school in Maine. They selected BCS "because the school's worldview aligns with their sincerely held religious beliefs and because of the school's high academic standards." The Department classifies BCS, which is fully accredited by the New England Association of Schools and Colleges, as a "private school approved for attendance purposes."

The Nelsons send their daughter to Erskine Academy, which is a private academy that is "approved" to receive tuition payments from SAUs. They would prefer, however, to send her to Temple Academy ("TA"), which is a private school that their son attends and that "offers a high-quality educational program that aligns with their sincerely held religious beliefs." Because the Nelsons "cannot afford to send more than one child to private school at their own expense," they would need the tuition assistance to send their daughter, like their son, to TA. Although TA is not currently "approved" for attendance purposes, it is fully accredited by the New England Association of Schools and Colleges and could otherwise satisfy the requirements for "basic school approval." Id. § 2901(1), (2)(a).

The plaintiffs have not requested that their respective SAUs pay tuition to their respective sectarian schools. But, that is so, they allege, only because, given the "nonsectarian" requirement, "such a request would be futile."

**D.**

The Commissioner answered the complaint by asserting that the plaintiffs lacked standing under Article III of the United States Constitution to bring their claims and that, in any event, they failed to state a claim upon which relief may be granted. See Fed. R. Civ. P. 12(b)(1); Fed. R. Civ. P. 12(b)(6). For these reasons, the answer contended that the complaint had to be dismissed.

Discovery was completed in early 2019. On February 7, 2019, the parties substituted A. Pender Makin for Hasson, as by that time she had replaced Hasson as the Commissioner. Soon thereafter, the parties agreed to a stipulated record and joint stipulated facts. Among other things, that stipulated record detailed the mission and educational philosophy at BCS and TA.

The stipulated record established that BCS has a mission of "instilling a Biblical worldview" in its students, with religious instruction "completely intertwined" in its curriculum and the Bible as its "final authority in all matters." Due to BCS's "high Biblical standards," moreover, it will not hire teachers who are homosexual or who "identify as a gender other

than on their original birth certificate."  TA similarly provides a "biblically-integrated education" and has an educational philosophy "based on a thoroughly Christian and Biblical world view."  In addition, its religious commitments are such that it will not hire teachers who are homosexual.

Also of relevance here, the stipulated record established that BCS and TA will not accept tuition assistance payments from an SAU if doing so would subject them to the provisions of the Maine Human Rights Act ("MHRA") that bar discrimination in employment based on sexual orientation and gender identity, Me. Stat. tit. 5, §§ 4553(4), 4553(10)(G), 4573-A(2), and thereby require them to change their hiring policies. At the same time, the record makes clear that, but for the "nonsectarian" requirement, they would "consider" accepting tuition payments from an SAU if doing so would not force them to make such a change.

**E.**

On April 5, 2019, the parties filed cross-motions for summary judgment, and soon thereafter amici curiae filed supporting legal memoranda in the District Court.  In addition, the United States filed a statement of interest in support of the plaintiffs' motion for summary judgment.

The parties eventually agreed, however, to submit the case to the District Court as cross-motions for judgment on the

- 10 -

stipulated record. 401 F. Supp. 3d 207, 208 (D. Me. 2019). The District Court granted judgment to the Commissioner while denying judgment to the plaintiffs. Id. at 212.

The District Court noted that our Circuit and the Maine Law Court "have upheld the Maine approach to school choice when the [SAU] does not provide public secondary education" against similar federal constitutional challenges. Id. at 209 (citing Eulitt, 386 F.3d 344; Strout, 178 F.3d 57; Bagley v. Raymond Sch. Dep't, 728 A.2d 127 (Me. 1999); and Anderson v. Town of Durham, 895 A.2d 944 (Me. 2006)). The District Court explained that "[w]hat provoke[d] renewal of the dispute now, in the face of those many past decisions, is a 2017 United States Supreme Court decision, Trinity Lutheran Church of Columbia, Inc. v. Comer," which the plaintiffs argued "radically changed the constitutional landscape of First Amendment free exercise challenges." Id.

In Trinity Lutheran, the Court considered a federal constitutional challenge to a state restriction on a state-provided subsidy for resurfacing playgrounds at preschool and daycare facilities. 137 S. Ct. 2012, 2017 (2017). The Court determined that, under the Free Exercise Clause, the application of that restriction to deny the subsidy to a church-owned preschool was subject to the strictest scrutiny, because it was based "solely" on the putative recipient's religious "character." Id. at 2021. The Court then concluded that the application of the

- 11 -

restriction in that manner could not survive such exacting review. Id. at 2024.

Before addressing the import of Trinity Lutheran to the case at hand, though, the District Court first addressed the Commissioner's contention that the plaintiffs lacked Article III standing. The District Court explained that it was "arguable" that BCS and TA, by accepting tuition assistance payments from an SAU, would be subject to the MHRA's prohibition against discrimination in employment based on sexual orientation when they otherwise would not be and that, in consequence, BCS's and TA's "willingness to 'consider' applying for approval for public funding may not go far." 401 F. Supp. 3d at 210. But, despite this uncertainty, the District Court held that the plaintiffs had Article III standing under our prior decision in Eulitt, which held that the plaintiffs there had standing to bring similar challenges to the "nonsectarian" requirement even though "there was no guarantee" that the sectarian private school that they had selected for their children to attend would agree to participate in the tuition assistance program if the "nonsectarian" requirement were invalidated. Id.

The District Court then turned to the question whether Trinity Lutheran controlled and noted that "[u]ntil a court of appeals revokes a binding precedent, a district court within the circuit is hard put to ignore that precedent unless it has

unmistakably been cast into disrepute by supervening authority."
Id. at 211 (quoting Eulitt, 386 F.3d at 349).  But, while the
plaintiffs contended that Trinity Lutheran abrogated our prior
decision in Eulitt, id. at 209, which upheld this "nonsectarian"
requirement against similar federal constitutional challenges, the
District Court disagreed, id. at 211-12.

     The District Court pointed out that four of the six
Justices who joined the majority opinion in Trinity Lutheran stated
in a footnote that "[t]his case involves express discrimination
based on religious identity with respect to playground
resurfacing.  We do not address religious uses of funding or other
forms of discrimination."  401 F. Supp. 3d at 211 (quoting Trinity
Lutheran, 137 S. Ct. at 2024 n.3).  It also observed that a seventh
Justice, who concurred in the judgment, explicitly left "the
application of the Free Exercise Clause to other kinds of public
benefits for another day."  Id. (quoting Trinity Lutheran, 137 S.
Ct. at 2027 (Breyer, J., concurring in the judgment)).

     Thus, the District Court concluded that Eulitt "has
certainly not been revoked" and that, because "Maine's educational
approach has not changed materially since" Eulitt, that precedent
controlled and required that the plaintiffs' challenges be
rejected.  Id. at 208 n.8, 211-12.  The District Court added,
however, that even though it could not, "as a trial [court], say
that Eulitt . . . has unmistakably been cast into disrepute[,]

- 13 -

[i]t is certainly open to the First Circuit to conclude that, after Trinity Lutheran, it should alter its Eulitt holding that sustained Maine's educational funding law." Id. at 211.

**F.**

The plaintiffs timely appealed on July 23, 2019. We heard arguments on January 8, 2020. Two further developments of note followed.

Two weeks after oral argument in our Circuit, the Supreme Court of the United States heard arguments in Espinoza v. Montana Department of Revenue, 140 S. Ct. 2246 (2020). There, the Court considered a free exercise challenge to a Montana Supreme Court decision that struck down a state program giving tax credits to those who donated to organizations providing scholarships to private schools. Id. at 2251-53. The Montana Supreme Court explained that it was invalidating the program because it conflicted with a provision of that state's constitution that, among other things, prohibited state aid to private schools controlled by a "church, sect, or denomination." See id. at 2251.

Then, on June 30, 2020, the United States Supreme Court ruled that, under the Free Exercise Clause of the United States Constitution, the Montana Supreme Court's decision applying the state constitution's no-aid provision in that manner was both subject to strict scrutiny and could not survive such review. Id. at 2260-64. Both parties to this appeal soon thereafter filed

Rule 28(j) letters that set forth their view of how <u>Espinoza</u> affected our decision here. Fed. R. App. P. 28(j). The plaintiffs contend that <u>Espinoza</u> accords with their contention that the "nonsectarian" requirement violates the Free Exercise Clause. The Commissioner contends that, even accounting for <u>Espinoza</u>, the District Court's ruling rejecting the plaintiffs' challenge to that requirement must be affirmed.

## II.

We start with the Commissioner's challenge to the plaintiffs' standing under Article III of the Constitution. <u>See</u> <u>Allen</u> v. <u>Wright</u>, 468 U.S. 737, 750 (1984). To establish Article III standing, "a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." <u>Friends of the Earth, Inc.</u> v. <u>Laidlaw Envtl. Servs. (TOC), Inc.</u>, 528 U.S. 167, 180-81 (2000). Our review is de novo. <u>Katz</u> v. <u>Pershing, LLC</u>, 672 F.3d 64, 70 (1st Cir. 2012).

The Commissioner accepts that, in principle, parents can establish standing to challenge the "nonsectarian" requirement, even though SAUs make the tuition assistance payments directly to

the schools that the parents choose for their children to attend. Nor, given Eulitt, do we see how she could contend otherwise.

We explained in Eulitt that the parent-plaintiffs in that case satisfied the injury-in-fact component of Article III standing because they plausibly alleged that the "nonsectarian" requirement denied them the "opportunity" to find religious secondary education for their children that would qualify for public funding. 386 F.3d at 353. According to Eulitt, the loss of that "opportunity" in and of itself constituted an injury in fact personal to the parents, as "[e]ven though it is the educational institution, not the parent, that would receive the tuition payments for a student . . . it is the parent who must submit such an application and who ultimately will benefit from the approval." Id.

With respect to the fairly-traceable component of Article III standing, moreover, we explained in Eulitt that because § 2951(2) "imposes restrictions on that approval, the parents' allegations of injury in fact to their interest in securing tuition funding provides a satisfactory predicate for standing." Id. And, in doing so, we relied on Bennett v. Spear, 520 U.S. 154 (1997), which we read to establish that the "harm 'produced by determinative or coercive effect' upon a third party satisfies the injury in fact requirement when the harm is 'fairly traceable' to

that effect." Eulitt, 386 F.3d at 353 (quoting Bennett, 520 U.S. at 168-69).

The Commissioner nevertheless contends that the parents here cannot meet the redressability component of standing and that Eulitt is not to the contrary because it did not address redressability at all. The Commissioner points chiefly to the fact that BCS and TA represent that they will not apply to be "approved" to receive tuition assistance payments if, by receiving such public funding, they would subject themselves to the MHRA's prohibition against discrimination in employment based on sexual orientation and thereby be forced to change their hiring policies. The Commissioner argues that, in consequence of this uncertainty about BCS's and TA's willingness to participate in the tuition assistance program, the plaintiffs cannot show that it is "likely" that their requested relief -- the invalidation of the "nonsectarian" requirement -- would redress their injury. See Lujan v. Defs. of Wildlife, 504 U.S. 555, 561 (1992) ("[I]t must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" (quoting Simon v. E. Ky. Welfare Rts. Org., 426 U.S. 26, 38, 43 (1976))).

In determining redressability, we must pay careful attention to both the nature of the plaintiffs' injury in fact and the role that the challenged governmental action plays in causing

- 17 -

it. When we do so here, it is evident that there is no redressability problem.

As Eulitt makes clear, the plaintiffs' injury in fact inheres in their having lost the "opportunity" to find religious secondary education for their children that would qualify for public funding, 386 F.3d at 353, even though, if the "nonsectarian" requirement were struck down, BCS and TA might not participate in the tuition assistance program. After all, Eulitt held that the plaintiffs there had suffered an injury in fact based on a similar lost opportunity, even though "it [was] entirely possible that the school [that they wished to send their children to] . . . is not interested in participating in Maine's tuition program and thereby subjecting itself to any number of concomitant state regulations." Id. at 352. Moreover, Eulitt makes clear that this lost opportunity -- and thus, this injury in fact -- is fairly traceable to the "nonsectarian" requirement, even if it is not likely that either school will participate in the tuition assistance program. See id. at 352-53.

True, BCS's and TA's concern about participating in the tuition assistance program centers on an expressly identified regulatory requirement -- namely, the one set forth in the MHRA -- rather than (as in Eulitt) unidentified ones. But, we do not see why that matters, given that it is not certain that the MHRA ultimately would lead either BCS or TA to decline tuition

- 18 -

assistance payments if they were eligible to receive them, not the least because of potentially fact-dependent free exercise concerns that might then arise, cf. Bostock v. Clayton County, 140 S. Ct. 1731, 1754 (2020) (noting that although "none of the employers before us today represent in this Court that compliance with Title VII will infringe their own religious liberties in any way," "other employers in other cases may raise free exercise arguments that merit careful consideration").

Thus, the invalidation of § 2951(2)'s "nonsectarian" requirement would restore the plaintiffs' now non-existent opportunity to find religious education for their children that qualifies for public funding. And that is so even though the continued existence of that opportunity would depend on choices that BCS and TA might make in the future about whether to participate in the tuition assistance program. For, as the case comes to us, neither school has yet extinguished that opportunity by choosing to disclaim a willingness to consider participating. Thus, it is not merely likely that the relief that the plaintiffs seek would redress their injury, it is certain that it would.

In arguing otherwise, the Commissioner points to cases that she contends have rejected plaintiffs' attempts to satisfy the redressability component of Article III standing on the ground that the effectiveness of their requested relief depended on the discretionary actions of third parties. See, e.g., Simon, 426

- 19 -

U.S.at 42-43; <u>Allen</u>, 468 U.S. at 757-59; <u>Warth</u> v. <u>Seldin</u>, 422 U.S. 490, 505-07 (1975); <u>Linda R.S.</u> v. <u>Richard D.</u>, 410 U.S. 614, 618-19 (1973). But, those cases did not involve -- as this one does -- an injury in fact that inhered in a lost opportunity to seek a government benefit. See <u>Simon</u>, 426 U.S. at 42-43; <u>Allen</u>, 468 U.S. at 757; <u>Warth</u>, 422 U.S. at 495-96; <u>Linda R.S.</u>, 410 U.S. at 617-18. Nor did they involve -- as this one does -- an injury in fact traceable to the challenged governmental action. See <u>Simon</u>, 426 U.S. at 42-43; <u>Allen</u>, 468 U.S. at 757-59; <u>Warth</u>, 422 U.S. at 506; <u>Linda R.S.</u>, 410 U.S. at 617-18.

By contrast, <u>Northeastern Florida Chapter of the Associated General Contractors of America</u> v. <u>City of Jacksonville</u> (<u>Northeastern Contractor</u>), 508 U.S. 656 (1993), shares those twin features of this case and points against the Commissioner's position as to redressability. There, the Supreme Court held that the plaintiff, an organization that represented private contractors, had standing to challenge a city ordinance's minority set-aside provision on federal equal protection grounds. <u>Id.</u> at 658-59, 669. In doing so, the Court did not require that organization to show that the city's contracting officers were likely to exercise their discretion to contract with any of those private contractors if the challenged provision were struck down. Rather, it held that it was enough that the organization had alleged that the set-aside provision denied the contractors the

opportunity to apply for the contracts on an equal footing with others.  Id. at 666 & n.5; see also id. at 665-66 (detailing a number of "cases [that] stand for the following proposition:  When the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the former group seeking to challenge the barrier need not allege that he would have obtained the benefit but for the barrier in order to establish standing").

The Commissioner contends that Northeastern Contractor is distinguishable because it involved a challenge to a restriction that operated directly on the plaintiff (as the representative of private contractors).  But, the injury in fact suffered by the plaintiffs here is, per Eulitt, no less fairly traceable to the restriction that they challenge, see 386 F.3d at 353, than the injury in fact in Northeastern Contractor was found to be to the restriction at issue there.  Accordingly, we do not see why these plaintiffs are any less able to satisfy the redressability component of standing than the private-contractor organization in that case.  For, while future developments might moot the plaintiffs' claims by making clear that neither BCS nor TA will participate in the tuition assistance program, the opportunity that underlies the plaintiffs' bid for standing -- as the loss of it constitutes the injury in fact -- exists at present but for the "nonsectarian" requirement.  We therefore proceed to the merits,

starting with the plaintiffs' challenge under the Free Exercise Clause.

## III.

The plaintiffs contend that the "nonsectarian" requirement discriminates against them based on their religion and thereby violates the Free Exercise Clause. We first explain why, given Trinity Lutheran and Espinoza, Eulitt does not dictate our resolution of this challenge. We then explain why, even considering that challenge afresh in the light of those two new precedents, the plaintiffs' free exercise challenge lacks merit. Our review is de novo. See Auburn Police Union v. Carpenter, 8 F.3d 886, 892 (1st Cir. 1993).

### A.

The plaintiffs accept the District Court's conclusion that Maine's tuition assistance program is "materially" the same as it was at the time of Eulitt. See 401 F. Supp. 3d at 208 n.8. They also accept that their free exercise challenge mirrors the one rejected there. The plaintiffs nonetheless contend that Eulitt does not control the outcome here under the law-of-the-circuit doctrine, see United States v. Wogan, 938 F.2d 1446, 1449 (1st Cir. 1991), because of Trinity Lutheran and Espinoza. We agree.

#### 1.

One exception to the law-of-the-circuit doctrine "comes into play when a preexisting panel opinion is undermined by

- 22 -

subsequently announced controlling authority, such as a decision of the Supreme Court, a decision of the en banc court, or a statutory overruling." Eulitt, 386 F.3d at 349. The other exists "when recent Supreme Court precedent calls into legitimate question a prior opinion of an inferior court." Id. at 350. "In that context," we have explained, "a reviewing court must pause to consider the likely significance of the neoteric Supreme Court case law before automatically ceding the field to an earlier decision." Id. ("[Where] significant developments in the pertinent jurisprudence . . . shed new light on the case law . . . [it is] incumbent upon us to reject a rote application of stare decisis . . . and to undertake a fresh analysis.").

The plaintiffs address both exceptions but focus on the second. Notably, Eulitt relied on that same exception in declining to reject the free exercise challenge there based solely on our prior ruling in Strout, in which we upheld the "nonsectarian" requirement against similar federal constitutional challenges. Eulitt, 386 F.3d at 350; Strout, 178 F.3d at 64-65.

Eulitt observed that Strout held that the "nonsectarian" requirement comported with the Free Exercise Clause because it effected at most a minimal burden on religious exercise (given that it merely restricted the availability of a subsidy) and its enactment was not motivated by animus against religion. Id. at 354-55 (citing Strout, 178 F.3d at 65). Eulitt also pointed out

that Strout emphasized Maine's interest in avoiding a violation of the Establishment Clause.  Id. at 350 (citing Strout, 178 F.3d at 64).

Eulitt explained, however, that Strout was no longer controlling because of two subsequently decided Supreme Court cases:  Locke v. Davey, 540 U.S. 712 (2004), and Zelman v. Simmons-Harris, 536 U.S. 639 (2002).  In Locke, the Supreme Court rejected a free exercise challenge to a law that barred state scholarship aid from being used for a devotional theology degree.  540 U.S. at 718.  Zelman, by contrast, rejected an Establishment Clause challenge to a state voucher program that made tuition assistance available to parents to send their children to religious private schools.  536 U.S. at 643-44, 662-63.

Eulitt did not decide that either of these intervening Supreme Court cases overruled Strout.  It held that Locke supported Strout and that Zelman was distinguishable on the facts with respect to the Establishment Clause issue.  386 F.3d at 349 & n.1, 354.  But, Eulitt concluded that those two then-recent Supreme Court precedents triggered the second exception to the law-of-the-circuit doctrine, because they "provide[d] [a] more focused direction than was available to the Strout panel."  Id. at 350.  For that reason, Eulitt held that it was "incumbent upon us to reject a rote application of stare decisis here and to undertake a fresh analysis."  Id.

- 24 -

Trinity Lutheran and Espinoza, especially when considered together, similarly "provide [a] more focused direction than was available to the [Eulitt] panel," id. That is so, as we next explain, in two respects.

**2.**

In Eulitt, we did not focus on whether the determination that a school qualifies as "nonsectarian" under § 2951(2) is based solely on its religious "status" or instead on the religious use that it would make of the tuition assistance payments. See id. at 354-56. In both Trinity Lutheran and Espinoza, however, it was of central importance whether the restriction at issue was based solely on the aid recipient's religious status.

Trinity Lutheran explained that the playground resurfacing program "expressly discriminate[d] against otherwise eligible recipients by disqualifying them from a public benefit solely because of their religious character" and held that, in consequence, it was subject to "the most exacting scrutiny." 137 S. Ct. at 2021. Trinity Lutheran indicated, moreover, that discrimination based solely on "religious character" did not depend on the religious "use" that the recipient would make of the subsidy, and so left unaddressed the level of scrutiny that would apply to a restriction of that kind. Id. at 2023 (explaining that the plaintiff in Locke "was not denied a scholarship because of who he was; he was denied a scholarship because of what he proposed

to do -- use the funds to prepare for the ministry," while "[h]ere there is no question that Trinity Lutheran was denied a grant simply because of what it is -- a church").

To be sure, as the District Court noted, 401 F. Supp. 3d at 211, Trinity Lutheran contained potentially important caveats regarding its application beyond the idiosyncratic context there at issue. But, Espinoza followed soon thereafter and explained that Trinity Lutheran "distilled" the Court's free exercise precedent "into the 'unremarkable' conclusion that disqualifying otherwise eligible recipients from a public benefit 'solely because of their religious character' imposes 'a penalty on the free exercise of religion that triggers the most exacting scrutiny.'" Espinoza, 140 S. Ct. at 2255 (quoting Trinity Lutheran, 137 S. Ct. at 2021).

Moreover, Espinoza clarified both that discrimination based solely on "religious character" is discrimination based solely on religious "status" and that such discrimination is distinct from discrimination based on religious "use." Id. To that point, Espinoza expressly rejected the contention that the Montana Supreme Court had held that the no-aid provision of the Montana Constitution excludes religious schools from receiving aid "not because of the religious character of the recipients, but because of how the funds would be used -- for 'religious education.'" Id. at 2255. Rather, the Court explained that, as

- 26 -

in Trinity Lutheran, the case before it "turn[ed] expressly on religious status and not religious use."  Id. at 2256.

In addition to clarifying that use-based religious discrimination differs (even if not in a necessarily outcome-determinative way) from solely status-based religious discrimination, Espinoza also explained why the latter type of discrimination triggered strict scrutiny.  Id. at 2257.  To deny aid to a religious school "simply because of what it is," the Court observed, "put[s] the school to a choice between being religious or receiving government benefits."  Id. (quoting Trinity Lutheran, 137 S. Ct. at 2023).  Such a "choice between being religious or receiving government benefits" is not free from coercion, because a requirement that a school "divorce itself from any religious control or affiliation" to receive aid for which it is otherwise eligible necessarily "punishe[s] the free exercise of religion." Id. at 2256 (alteration in original) (emphasis added) (quoting Trinity Lutheran, 137 S. Ct. at 2022).[1]

---

[1]  The Court's analysis resonates with unconstitutional conditions doctrine in the First Amendment area more generally. See, e.g., Rust v. Sullivan, 500 U.S. 173, 197-99 (1991) ("[O]ur 'unconstitutional conditions' cases involve situations in which the Government has placed a condition on the recipient of the subsidy rather than on a particular program or service, thus effectively prohibiting the recipient from engaging in the protected conduct outside the scope of the federally funded program." (emphasis in original)); Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc. (AOSI I), 570 U.S. 205, 218 (2013) (finding the funding requirement at issue to violate the First Amendment because it "goes beyond defining the limits of the

Thus, Espinoza held that the solely status-based religious discrimination involved there triggered strict scrutiny, even as it expressly left unaddressed the level of scrutiny applicable to a use-based restriction. Id. at 2257. For that reason, in the wake of Espinoza, the use/status distinction is clearly potentially relevant to the determination of the level of scrutiny that must be applied here. Yet, Eulitt did not give that distinction the "more focused" attention, 386 F.3d at 350, that we now know that it warrants.

**3.**

The other respect in which Trinity Lutheran and Espinoza require us to conclude that we may not simply decide this case based on Eulitt has to do with its reliance on Locke in declining to apply strict scrutiny to the "nonsectarian" requirement. The problem here is that Trinity Lutheran and Espinoza each offer significant commentary on Locke and its scope that Eulitt did not have the benefit of considering. See Espinoza, 140 S. Ct. at 2257-59; Trinity Lutheran, 137 S. Ct. at 2023-24.

Eulitt read Locke to "confirm[] that the Free Exercise Clause's protection of religious beliefs and practices from direct government encroachment does not translate into an affirmative requirement that public entities fund religious activity simply

---

federally funded program to defining the recipient"); FCC v. League of Women Voters, 468 U.S. 364, 399-400 (1984) (similar).

because they choose to fund the secular equivalents of such activity." Eulitt, 386 F.3d at 354. This "room for play in the joints," Eulitt then held, extended beyond the clerical training considered in Locke, as it understood that case to stand "more broadly" for the proposition that "state entities, in choosing how to provide education, may act upon their legitimate concerns about excessive entanglement with religion, even though the Establishment Clause may not require them to do so." Id. at 355 (quoting Locke, 540 U.S. at 718). Therefore, Eulitt relied on Locke to conclude that even a restriction that "lacks religious neutrality on its face" does not necessarily pose free exercise concerns unless the decision not to fund constitutes impermissible animus. Id.

Espinoza, however, distinguished Locke based on what it described as the narrow use-based nature of the restriction there and the "'historic and substantial' state interest" underlying it. 140 S. Ct. at 2257-58 (quoting Locke, 540 U.S. at 725). Espinoza noted in this regard that the restriction involved in Locke permitted the scholarship aid to be used at "pervasively religious schools" and that the restriction on that aid was in line with a historic tradition against using public funds to train clergy. Id. (quoting Locke, 540 U.S. at 724). Thus, Espinoza provides, at the very least, a "more focused direction than was available to the [Eulitt] panel," Eulitt, 386 F.3d at 350, as to Locke's bearing

on our assessment of the level of scrutiny that applies to the "nonsectarian" requirement that § 2951(2) sets forth.

## 4.

The Commissioner makes one additional argument for why, despite Trinity Lutheran and Espinoza, the second exception to the law-of-the-circuit doctrine does not apply here. She argues that Maine's school aid program differs substantially from the ones at issue in Espinoza and Trinity Lutheran. "Maine's tuition program," the Commissioner says, "is not: a 'voucher' or 'school choice' program where parents are given the opportunity to select a school other than the public school that their student would otherwise attend." Rather, Maine uses the tuition benefit to "ensur[e]" that the state-paid-for education at private schools in those districts is "roughly equivalent to the education [students] would receive in public schools" but cannot obtain because it is not otherwise offered.

But, the question under the second exception to the law-of-the-circuit doctrine is whether intervening precedent requires a fresh look at what we decided before, not whether it dictates a different result. Indeed, even though the aid programs in Locke and Zelman differed from Maine's tuition assistance program, see Eulitt, 386 F.3d at 349 & n.1, 355, Eulitt still held that those then-recent Supreme Court precedents required us to look at our earlier precedent in Strout anew, id. at 350. Accordingly,

whatever the bounds of this exception to the law-of-the-circuit doctrine may be as a general matter, we are confident that it applies here and thus that Eulitt's free exercise ruling is no longer controlling.

**B.**

With Trinity Lutheran and Espinoza now on the scene, we take up the plaintiffs' free exercise challenge afresh. In doing so, we may assume up front, as the plaintiffs assert, that the Establishment Clause does not require Maine to impose the "nonsectarian" requirement on its tuition assistance program.[2] For, as we will explain, the plaintiffs' free exercise challenge fails even if we make that assumption, Trinity Lutheran and Espinoza notwithstanding. To explain why, we first address the plaintiffs' claim of religious discrimination based on Trinity Lutheran and Espinoza. We then turn to the distinct variant of their free exercise challenge in which they point to specific statements in § 2951(2)'s legislative record that they contend reflect religious animus -- a species of free exercise challenge,

---

[2] As we noted in Eulitt, "[e]ven after Zelman and [Locke], it is fairly debatable whether or not the Maine tuition program could survive an Establishment Clause challenge if the state eliminated section 2951(2) and allowed sectarian schools to receive tuition funds," given that the Maine program is "substantially narrower" than the school-choice program under scrutiny in Zelman because it serves as a backstop for children who have no opportunity to attend a public school. 386 F.3d at 349 & n.1. So, it is hardly clear that there is no legitimate Establishment Clause concern supporting the state's decision to impose the restriction.

we note, in which the Supreme Court's most recent precedents in this area are of less relevance.

## 1.

In claiming religious discrimination based on Trinity Lutheran and Espinoza, the plaintiffs do not dispute that all Mainers who reside in SAUs with no public secondary school of their own are equally free to use the tuition assistance to obtain a secular education at a private school. See Eulitt, 386 F.3d at 354 n.5. They contend, however, that the "nonsectarian" requirement impermissibly singles them out for unequal treatment based on religion nonetheless, because it precludes them from "either (1) . . . receiving the Tuition Benefit because they have exercised their freedom of religion by enrolling their students in religious schools, or (2) . . . exercising their freedom of religion to enroll their student in a religious school because they cannot afford tuition without receiving the Tuition Benefit."

In fleshing out this argument, the plaintiffs assert that their "desire for religious educational options flows from, and is inextricably intertwined with, their religious status." They further contend that "[t]o deny them an otherwise available benefit because they desire a religious education for their children is to deny them that benefit based on their religious status." Accordingly, they assert, the "nonsectarian" requirement is like the restrictions on the subsidies at issue in Trinity

Lutheran and Espinoza, because it, too, necessarily penalizes their religious exercise.

We proceed first by answering a pair of questions that are embedded in this claim of religious discrimination: (a) What constitutes discrimination based "solely on religious status"?,[3] and (b) Does the "nonsectarian" requirement discriminate in that way?[4] As we will explain, the "nonsectarian" requirement does not discriminate based solely on religious status. But, having come that far, we still then must address one more question: (c) Does the "nonsectarian" requirement punish the plaintiffs' religious

---

[3] We recognize that, if the Commissioner were right that the plaintiffs' free exercise challenge would fail even if the determination of whether a school qualifies as "nonsectarian" is based solely on its religious status, we could simply assume as much in deciding the merits of the challenge. But, it is not our practice to resolve hypothetical federal constitutional questions, especially when doing so would result in a broader constitutional ruling than the facts at hand require. See Ala. State Fed'n of Lab. v. McAdory, 325 U.S. 450, 461 (1945).

[4] The District Court did not itself directly engage with the status- versus use-based distinction, but the parties have, and it is one of law. We thus see no reason to prolong the litigation by vacating and remanding for the District Court to assess the import of the fact that the "nonsectarian" requirement is not based solely on religious status. See Cutting v. City of Portland, 802 F.3d 79, 86 (1st Cir. 2015) (addressing a legal question in the first instance "despite the fact that the District Court ha[d] not passed on it"). We note as well that none of the parties has asked us to remand in light of Espinoza or argued that, insofar as the "nonsectarian" requirement is use based, it would not bar BCS or TA from qualifying as "nonsectarian." Indeed, the record makes clear that they would not so qualify, given what the record shows about the way each would use the funds.

- 33 -

exercise nonetheless?  For the reasons set forth below, it does not.

**a.**

Espinoza offers the clearest guidance as to what constitutes, with respect to doling out aid, solely status-based religious discrimination as opposed to discrimination based on religious use.  Such status-based discrimination is manifest, Espinoza instructs, when a restriction is based solely on the aid recipient's affiliation with or control by a religious institution.

Espinoza explained that the Montana Constitution's no-aid provision was based solely on religious status -- and thus not on religious use -- because the Montana Supreme Court "repeatedly explained that the no-aid provision bars aid to 'schools controlled in whole or in part by churches,' 'sectarian schools,' and 'religiously-affiliated schools.'" Id. (quoting Espinoza v. Mont. Dep't of Revenue, 435 P.3d 603, 611-13 (Mont. 2018)).  Espinoza emphasized, too, that the Montana Supreme Court "noted that most of the private schools that would benefit from the program were 'religiously affiliated' and 'controlled by churches'" and that the Montana Supreme Court "ultimately concluded that the scholarship program ran afoul of the Montana Constitution by aiding 'schools controlled by churches.'"  Id. (quoting Espinoza, 435 P.3d at 613-14).  Finally, it was on this basis that Espinoza held

that "[t]he Montana Constitution discriminates based on religious status just like the Missouri policy in Trinity Lutheran," as it explained that the policy there "excluded organizations 'owned or controlled by a church, sect, or other religious entity.'" Id. (quoting Trinity Lutheran, 137 S. Ct. at 2017).

Espinoza made clear, moreover, that discrimination in handing out school aid based on the recipient's affiliation with or control by a religious institution differed from discrimination in handing out that aid based on the religious use to which the recipient would put it. Espinoza acknowledged that passages in the Montana Supreme Court's decision indicated that the state constitution's no-aid provision "has the goal or effect of ensuring that government aid does not end up being used for 'sectarian education' or 'religious education.'" Id. (emphasis added) (quoting Espinoza, 435 P.3d at 613-14). It also considered the contention that the no-aid provision was being applied by the Montana Supreme Court based on the religious use that those schools would make of that aid -- rather than solely based on their religious status -- because "[g]eneral school aid . . . could be used for religious ends by some recipients, particularly schools that believe faith should 'permeate' everything they do." Id. But, Espinoza held that those use-based "considerations were not the Montana Supreme Court's basis for applying the no-aid provision to exclude religious schools; that hinged solely on religious

- 35 -

status." Id. As the Court explained, "[s]tatus-based discrimination remains status based even if one of its goals or effects is preventing religious organizations from putting aid to religious uses." Id.

**b.**

Drawing on Espinoza's analysis of the nature of solely status-based discrimination and how it differs from discrimination based on religious use, we come, then, to the next question that we must confront: Does the "nonsectarian" requirement in § 2951(2) discriminate in that manner? We conclude that it does not, because, as we will explain, § 2951(2) imposes a use-based restriction.

Notably, in response to the plaintiffs' interrogatories, Commissioner Hasson stated that the Department determines if a school satisfies § 2951(2)'s "nonsectarian" requirement in the following way:

> In making its determination whether a particular school is in compliance with Section 2951, the Department considers a sectarian school to be one that is associated with a particular faith or belief system and which, in addition to teaching academic subjects, promotes the faith or belief system with which it is associated and/or presents the material taught through the lens of this faith. While affiliation or association with a church or religious institution is one potential indicator of a sectarian school, it is not dispositive. The Department's focus is on what the school teaches through its

- 36 -

<u>curriculum and related activities, and how the material is presented</u>.

(emphasis added). Notably, too, the current Commissioner and the Maine Attorney General represent to us that they share the former Commissioner's view that the determination whether a school is "nonsectarian" depends on the sectarian nature of the educational instruction that the school will use the tuition assistance payments to provide. <u>See</u> Appellee's Br. at 39 ("Nor are the sectarian schools being denied participation in the tuition program because they are operated by churches. . . . Sectarian schools are denied funds not because of who they are but because of what they would do with the money -- use it to further the religious purposes of inculcation and proselytization.").

The text of § 2951(2) contains nothing that expressly is to the contrary, as it does not, by its terms, make control by or affiliation with a religious institution determinative of a school's eligibility to receive tuition assistance payments from an SAU. Nor does the inclusion of the word "nonsectarian" in § 2951(2) in and of itself reveal that Maine must have intended to impose a solely status- rather than use-based restriction in that provision. In fact, in <u>Espinoza</u> the Court acknowledged that the Montana Supreme Court understood the no-aid provision to "forbid[] aid to any school that is 'sectarian,' 'religiously affiliated,' <u>or</u> 'controlled in whole or in part by churches,'" but then focused,

in deeming that provision to be solely status based, on the bar that it imposed on "aiding 'schools controlled by churches.'" 140 S. Ct. at 2256 (emphases added) (quoting Espinoza, 435 P.3d at 611-14); see also id. (describing the no-aid provision as being similar to Trinity Lutheran's exclusion of "organizations 'owned by or controlled by a church, sect, or other religious entity.'" (quoting Trinity Lutheran, 137 S. Ct. at 2017)).

The inclusion of the trailing phrase "in accordance with the First Amendment" in the text of § 2951(2) is also not at odds with the use-based construction that the Commissioner and the Attorney General of Maine put forth. If anything, in light of Espinoza, that phrase accords with a reading of § 2951(2) that would ensure the inquiry into whether a school is "nonsectarian" does not turn solely on whether it is religiously affiliated or controlled but depends instead on the sectarian nature of the instruction that it will provide to tuition assistance beneficiaries. See Nat'l Pharmacies, Inc. v. Feliciano-de-Melecio, 221 F.3d 235, 241-42 (1st Cir. 2000) ("[F]ederal courts are . . . instructed to render interpretations of state law by using the same methods that the state court would use, . . . including the principle that statutes should ordinarily be given a constitutional interpretation where fairly possible."); Portland Pipe Line Corp. v. Env't Improvement Comm'n, 307 A.2d 1, 15 (Me. 1973) ("[I]f . . . provisions of [an] Act are susceptible of a

reasonable interpretation which would satisfy constitutional requirements . . . we are bound to adopt that interpretation.").

Reinforcing our reasons to accept the proffered use-based construction of the "nonsectarian" requirement is the fact that the plaintiffs develop no contrary argument as to how this provision should be construed. They thus provide us with no reason to reject the representations by the Commissioner and the Maine Attorney General that the restriction is use based.

The United States, for its part, did contend for the first time at oral argument that we could consider the Maine Law Court's statement in Bagley in 1999 that § 2951(2) "explicitly excludes only those private schools with religious affiliations," 728 A.2d at 137. But, that passage, in context, does not indicate that the Maine Law Court -- prior to Trinity Lutheran and Espinoza -- meant to take a position regarding the use/status distinction, such that we may reject the contrary representation made to us by Maine's Attorney General and the Commissioner. Cf. Forsyth County v. Nationalist Movement, 505 U.S. 123, 131 (1992) ("In evaluating respondent's facial challenge, we must consider the county's authoritative constructions of the ordinance, including its own implementation and interpretation of it."); Cutting v. City of Portland, 802 F.3d 79, 84 (1st Cir. 2015) (recognizing that we "may read a law in light of the limits set forth in a government's 'authoritative[] constru[ction]' of that law if doing so would

'render [that law] constitutional'" (alterations in original) (quoting City of Lakewood v. Plain Dealer Publ'g Co., 486 U.S. 750, 770 n.11 (1988))).

We do not dispute that, as the United States asserts, some benefits restrictions that are nominally based on religious use are solely based on religious status. See Office of Legal Counsel, Religious Restrictions on Capital Financing for Historically Black Colleges and Universities, 2019 WL 4565486, at *15 (Aug. 15, 2019) ("To consider all activities of a religious school to be 'related to' sectarian instruction, and prohibit funding for the school on that basis, would risk collapsing the distinction between religious status and religious use . . . ."). But, even if that may be so in some instances, the record supports the Commissioner's representation that this restriction is not of that kind, and neither the plaintiffs nor the United States develops an argument that it is status based in disguise.[5]

Accordingly, we proceed on the understanding that this restriction, unlike the one at issue in Espinoza, does not bar

---

[5] At oral argument, the United States suggested that some evidence in the record raises a question as to whether the Department applies the criteria for determining whether a school is "nonsectarian" exactly how Commissioner Hasson described. But, it did not make that argument in its brief to us, nor did the plaintiffs themselves. See Piazza v. Aponte Roque, 909 F.2d 35, 37 (1st Cir. 1990) ("Except in extraordinary circumstances not present here, a court of appeals will not consider an issue raised for the first time at oral argument."). In any event, the treatment identified does not concern either BCS or TA.

schools from receiving funding simply based on their religious identity -- a status that in and of itself does not determine how a school would use the funds that it receives to provide educational instruction.  See Espinoza, 140 S. Ct. at 2261 (explaining that "[a] State need not subsidize private education[,] [b]ut once a State decides to do so, it cannot disqualify some private schools solely because they are religious" (emphasis added)).  Instead, we understand this restriction to bar BCS and TA from receiving the funding based on the religious use that they would make of it in instructing children in the tuition assistance program.[6]

### c.

That brings us to the plaintiffs' contention that the "nonsectarian" requirement is subject to strict scrutiny even if it is use- rather than solely status-based.[7]  Here, the plaintiffs

---

[6] For that reason, we need not and do not decide whether the Commissioner is right that, under Espinoza, it would be permissible to restrict funding here based solely on a school's religious status due to the nature of Maine's tuition assistance program (as it provides funding for only the rough equivalent of the public school education that is not available in SAUs that operate no public secondary school of their own), the state's assertedly compelling interest in declining to fund discrimination based on sexual orientation or gender identity, or, for that matter, some other reason, see Locke, 540 U.S. at 718-19 (discussing the "play in the joints" between the Establishment Clause and the Free Exercise Clause (quoting Walz v. Tax Comm'n, 397 U.S. 664, 669 (1970))).  Because no solely status-based restriction is in place, no such question is before us.

[7] The plaintiffs do not argue that the "nonsectarian" requirement violates the Free Exercise Clause if it is subject

- 41 -

rely not on any controlling Supreme Court authority but on Justice Gorsuch's concurrence in Trinity Lutheran, which Justice Thomas joined and which Espinoza itself noted in explaining that "[s]ome Members of the Court . . . have questioned whether there is a meaningful distinction between discrimination based on use or conduct and that based on status."  140 S. Ct. at 2257 (citing Trinity Lutheran, 137 S. Ct at 2025 (Gorsuch, J., concurring) (stating that he "harbor[s] doubts about the stability of such a line" between "discriminat[ion] on the basis of religious status and religious use")).[8]  We are not persuaded.

The plaintiffs are right that Justice Gorsuch's Trinity Lutheran concurrence questioned the import of the status/use distinction to the level-of-scrutiny determination.  It explained that the Free Exercise Clause "guarantees the free exercise of religion, not just the right to inward belief (or status)" and that "[g]enerally the government may not force people to choose between participation in a public program and their right to free

_____

only to rational basis review because it is use based.  They do argue in connection with their Equal Protection Clause challenge that this restriction cannot survive even that more forgiving form of review.  To the extent the plaintiffs mean to press that same contention in connection with their free exercise challenge, it fails for the same reasons we give below for rejecting that contention in addressing that challenge.  See infra.

[8] The United States, relying on this concurrence, emphasizes that the line between religious use and religious status "may sometimes be difficult to draw."  But, the United States does not assert that no such line may be drawn here.

exercise of religion." 137 S. Ct. at 2026 (Gorsuch, J., concurring) (second emphasis added). Therefore, the concurrence argued, it should not "matter whether we describe that benefit, say, as closed to Lutherans (status) or closed to people who do Lutheran things (use)." Id.

We note also that Justice Gorsuch reasserted this same line of reasoning in his concurrence in Espinoza. In emphasizing that "[o]ur cases have long recognized the importance of protecting religious actions, not just religious status," that concurrence noted that "we have recognized the First Amendment's protection for religious conduct in public benefits cases." Espinoza, 140 S. Ct. at 2276-77 (Gorsuch, J., concurring). When the government offers benefits, it argued, "those benefits necessarily affect the 'baseline against which burdens on religion are measured.'" Id. (quoting Locke, 540 U.S. at 726 (Scalia, J., dissenting)). Thus, the concurrence explained, in Sherbert v. Verner, 374 U.S. 398 (1963), and Thomas v. Review Board of Indiana Employment Security Division, 450 U.S. 707 (1981), the government's denial of benefits solely "because of conduct mandated by religious belief" ran afoul of the Free Exercise Clause. Espinoza, 140 S. Ct. at 2277 (Gorsuch, J., concurring) (quoting Thomas, 450 U.S. at 718).

There is no doubt that Justice Gorsuch's concurrences support the uncontroversial proposition that a restriction on the availability of tuition assistance to Mainers who go to church

would violate the Free Exercise Clause, even though nominally that restriction would target their religious conduct rather than their religious status.  But, this restriction is not like that, as it limits the benefit to only those who would use it for nonsectarian instruction.  It thus does not target any religious activity apart from what the benefit itself would be used to carry out.

That is important because nothing in either one of Justice Gorsuch's concurrences suggests that the government penalizes a fundamental right simply because it declines to subsidize it.  See Regan v. Taxation with Representation of Wash., 461 U.S. 540, 549 (1983) ("[A] legislature's decision not to subsidize the exercise of a fundamental right does not infringe the right, and thus is not subject to strict scrutiny.").  Thus, even under the rationale set forth in Justice Gorsuch's concurrences, we still must determine the baseline that Maine has set by the benefit that it has made available through the tuition assistance program.  For, only by doing so can we determine whether, given that baseline, the "nonsectarian" requirement merely reflects Maine's refusal to subsidize religious exercise (by excluding only those who are seeking a distinct benefit) or instead penalizes religious exercise (by excluding those who seek the very same benefit as everyone else solely based on the religious things they do).

From this vantage, we find it significant that Maine provides tuition assistance only to those who cannot get the benefits of a free public school education directly from their SAU. That limitation on the program's scope -- which is itself not based on either a recipient's religious use or status -- reveals that the program is designed "to ensur[e]," as the Commissioner puts it, that students who cannot get a public school education from their own SAU can nonetheless get an education that is "roughly equivalent to the education they would receive in public schools." See Hallissey v. Sch. Admin. Dist. No. 77, 755 A.2d 1068, 1073 (Me. 2000) ("Within the statutory scheme, section 5204(4)'s function is limited to authorizing the provision of tuition subsidies to the parents of children who live within school administrative units that simply do not have the resources to operate a public school system, and whose children would otherwise not be given an opportunity to receive a free public education.").

We find it significant, too, for purposes of defining the baseline, that the state defines the kind of educational instruction that public schools provide as secular instruction, based on its "interest in maintaining a religiously neutral public education system in which religious preference is not a factor." See, e.g., 121 Me. Legis. Rec. S-640 (1st Reg. Sess. May 14, 2003) (statement of Sen. Martin) ("Because we retain a responsibility of a publicly funded education, we must look carefully at what we

believe is an appropriate form of education for our children."). For while that restriction on the content of public school instruction is religion based, it is also wholly legitimate, as there is no question that Maine may require its public schools to provide a secular educational curriculum rather than a sectarian one. See, e.g., Sch. Dist. of Abington v. Schempp, 374 U.S. 203, 226 (1963); Epperson v. Arkansas, 393 U.S. 97, 106-07 (1968).

Putting these two points together, we conclude that, given the baseline that Maine has set through the benefit provided by the tuition assistance program, the plaintiffs in seeking publicly funded "biblically-integrated" or religiously "intertwined" education are not seeking "equal access" to the benefit that Maine makes available to all others -- namely, the free benefits of a public education. The plaintiffs are right that, from all the record indicates, BCS is "approved" by the Department for attendance purposes, and TA meets the requirements to be "approved" as such. See Me. Stat. tit. 20-A, § 2901. But, they are wrong to argue that it follows that either school for that reason offers a type of educational instruction that is so like what a public school provides that it is necessarily a good substitute for a public school education. That Maine's public schools cannot provide pervasively sectarian instruction demonstrates that the benefit that Maine provides no more sets a baseline that requires the state to subsidize sectarian

instruction than an SAU's funding of its own public secondary school would set one that would require it to provide funding for sectarian education as well.

To be sure, by making the free benefits of public education available to children in SAUs that do not operate their own public secondary schools, Maine makes tuition assistance available to some students who might have chosen a private secular education if they lived in an SAU with a public secondary school.[9] But, Maine need not for that reason also sweep in those children who would opt out of the public option in favor of a private sectarian education no matter where they lived, precisely because Maine has permissibly concluded that the benefit of a free public education is tied to the secular nature of that type of instruction. See Schempp, 374 U.S. at 226; W. Va. State Bd. of Educ. v. Barnette, 319 U.S. 624, 637 (1943).[10]

---

[9] The plaintiffs make no argument that the tuition assistance program could operate without including any private schools. Given that Maine is "still largely rural" and that so many of its SAUs do not operate public secondary schools, there is no reason to think that this would be feasible. Maine has long relied on private academies to fill gaps where public secondary school education is not accessible. See Br. for Maine School Boards Assoc. & Maine School Superintendents Assoc. at 5-9.

[10] For this reason, the state's interest in avoiding the diversion of resources from its public education program is not "underinclusive" in the way that Espinoza found Montana's asserted interest in "ensuring that government support is not diverted to private schools" to be, 140 S. Ct. at 2261. In addition, there is a legitimate reason for the tuition assistance program in Maine to include private secular schools, just as there is a legitimate interest, aside from the general interest in protecting against

Our conclusion on this score accords with the free exercise rulings in Thomas and Sherbert that Justice Gorsuch's Espinoza concurrence invokes. See Espinoza, 140 S. Ct. at 2276 (Gorsuch, J., concurring). Those cases considered limitations on unemployment benefits that deemed a refusal to work compelled by one's religious faith "without good cause," Sherbert, 374 U.S. at 401 (quoting S.C. Code Ann. § 68-114 (1952)); Thomas, 450 U.S. at 709 n.1 (quoting Ind. Code § 22-4-15-1), even though a non-faith-based reason for refusing to work was deemed to be for good cause. See Sherbert, 374 U.S. at 399-401 (considering a state's denial of unemployment benefits to a woman because she refused to labor on "the Sabbath Day of her faith"); Thomas, 450 U.S. at 709-12 (considering a state's denial of unemployment benefits when the plaintiff had resigned from his job "because his religious beliefs forbade participation in the production of armaments"). Such a differential assessment of what constituted good cause for not working was deemed to reflect, necessarily, a devaluation of religious motivations, Bowen v. Roy, 476 U.S. 693, 708 (1986) (plurality opinion); Church of the Lukumi Babalu Aye, Inc. v. City

the diversion of funds for public education, in Maine not paying for sectarian education through that program. Given the way that Maine has structured SAUs' options for extending the benefits of free public education, tuition assistance to private secular schools serves not to divert funds from the public education system but rather to provide an alternative mechanism to extend the benefits of that public education system to children in Maine who otherwise would be denied them.

of Hialeah, 508 U.S. 520, 537-38 (1993), and thus "tend[ed] to exhibit hostility" toward religion, Roy, 476 U.S. at 708.

There is no such concern presented here. Because Maine permissibly requires public educational instruction to be nonsectarian for reasons that reflect no hostility to religion, it betrays no hostility toward religion when it imposes a use-based "nonsectarian" restriction on the public funds that it makes available for the purpose of providing a substitute for the public educational instruction that is not otherwise offered. As we put it in Eulitt, "state entities, in choosing how to provide education, may act upon their legitimate concerns about excessive entanglement with religion, even though the Establishment Clause may not require them to do so." 386 F.3d at 355 (emphasis added).[11]

We recognize that, in so stating, Eulitt relied on Locke. Potentially, that is of concern. After all, although Trinity Lutheran and Espinoza addressed solely status-based aid restrictions, each distinguished Locke in consequence of the

---

[11] Once a state opens up the possibility that private schooling in general may serve as a substitute for the instruction that a public school provides, it may be that a private school's control by or affiliation with a religious institution in and of itself could not suffice to render its educational instruction an inadequate substitute under the Free Exercise Clause, based on the logic of Sherbert and Thomas. We do not address whether such a solely status-based restriction in the context of a tuition assistance program structured as Maine's is would raise that concern, though, as we have here a restriction that targets only the use of the tuition assistance for sectarian instruction itself.

nature of the use-based restriction that it involved rather than simply in consequence of the fact that the restriction was use based. Trinity Lutheran, 137 S. Ct. at 2023; Espinoza, 140 S. Ct. at 2257. In particular, Espinoza noted that in Locke the state permitted the scholarship funds to be used at a "pervasively religious school[]" so long as the student was not pursuing a devotional theology degree there, 140 S. Ct. at 2257 (quoting Locke, 540 U.S. at 724),[12] and that it did so in accord with the unique tradition against state support for clerical training, id. at 2257-59. By contrast, Espinoza explained, the no-aid provision in the Montana Constitution was not so tailored, id. at 2257, and no similar tradition supported a ban on state support for religious schools, id. at 2259.

But, even if Espinoza suggests that Locke is a narrower ruling than Eulitt understood it to be, we do not read Espinoza to hold that a use-based restriction on school aid necessarily violates the Free Exercise Clause unless it mimics the restriction in Locke. Espinoza certainly does not expressly set forth any such rule. And here, the "nonsectarian" requirement operates not as a restriction on the provision of general aid to private schools

---

[12] Trinity Lutheran also noted that Locke "went 'a long way toward including religion in its benefits'" for the additional reason that a student in the scholarship program could "use his scholarship to pursue a secular degree at one institution while studying devotional theology at another." 137 S. Ct. at 2023 (quoting Locke, 540 U.S. at 724).

but as part and parcel of Maine's means of providing the benefits of a free public education to those who otherwise cannot obtain them because such education is not otherwise available at all.

Thus, even accounting for Espinoza's discussion of Locke, the "nonsectarian" requirement neither "punishes" a recipient solely for being controlled by or affiliated with a religious institution nor imposes a "penalty" for doing religious things. Rather, it limits a subsidy that the state may permissibly restrict to those schools -- whether or not religiously affiliated or controlled -- that provide, in the content of their educational instruction, a rough equivalent of the public school education that Maine may permissibly require to be secular but that is not otherwise accessible. See Eulitt, 386 F.3d at 354 ("The fact that the state cannot interfere with a parent's fundamental right to choose religious education for his or her child does not mean that the state must fund that choice.").

Nor, we should add, is it evident how Maine could craft any more tailored restriction to serve the discrete and permissible end this tuition assistance program serves without intruding into private religious practice in ways that it reasonably may want to avoid for reasons at least consonant with the Religion Clauses. Cf. Eulitt, 386 F.3d at 355-56; Bagley, 728 A.2d at 147. Given limited public funds, the state's rural character, and the concomitant scarcity of available public school options for

residents of many SAUs, we do not see why the Free Exercise Clause compels Maine either to forego relying on private schools to ensure that its residents can obtain the benefits of a free public education or to treat pervasively sectarian education as a substitute for it. Cf. Espinoza, 140 S. Ct. at 2254 (recognizing that there is "play in the joints" between the Religion Clauses (quoting Trinity Lutheran, 137 S. Ct. at 2019)); Locke, 540 U.S. at 719 ("This case involves that 'play in the joints . . . .'"). We turn, then, to the plaintiffs' other free exercise contention, which concerns whether the "nonsectarian" requirement is the product of religious animus.

**2.**

Here, Espinoza and Trinity Lutheran figure much less prominently. In fact, the latter did not mention animus at all and the former referred to animus only in discussing whether there was a tradition against state support of religious schools that could create a "'historic and substantial' state interest" per Locke. See Espinoza, 140 S. Ct. at 2257-58 (quoting Locke, 540 U.S. at 725).

Espinoza explained in that regard that such a tradition should not "inform our understanding of the Free Exercise Clause," given the "checkered" history that many no-aid provisions share with the Blaine Amendment of the 1870s. Id. at 2258-59. But, the Blaine Amendment is not at issue here, and, in fact, Maine's

- 52 -

constitution never contained such a "no-aid" clause.  See Bagley, 728 A.2d at 132 n.8.

Thus, nothing in Espinoza -- or Trinity Lutheran -- calls into question our treatment of animus in Eulitt, in which we held that it played no part in the enactment of § 2951(2).  See Eulitt, 386 F.3d at 355 (finding that § 2951(2) "passes [Locke's] test" "for smoking out an anti-religious animus" "with flying colors"). In fact, our conclusion that the provision bars only religious uses within a program that is a substitute for a free, secular public education reinforces that conclusion.  See, e.g., Zorach v. Clauson, 343 U.S. 306, 314 (1952) (accepting that "[g]overnment may not . . . undertake religious instruction" in the course of rejecting "a requirement that the government show a callous indifference to religious groups").  No exception to the law-of-the-circuit doctrine is appropriate here; Trinity Lutheran and Espinoza do not "undermine[]" our treatment of the animus issue in Eulitt nor do those opinions even "call[] into legitimate question" our analysis.  Eulitt, 386 F.3d at 349-50.  Accordingly, these two recent cases present no grounds to deviate from Eulitt when considering animus.

The plaintiffs do separately press their animus claim by analogizing certain statements that Maine legislators made while the state legislature considered (and rejected) an attempt to repeal the "nonsectarian" requirement in the wake of Zelman (and

before Eulitt) to the statements of state civil rights commission members that the Supreme Court, post-Eulitt, considered in Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Commission, 138 S. Ct. 1719 (2018). But, the Supreme Court found the statements in Masterpiece Cakeshop concerning because they were made in the specific context of "an adjudicatory body deciding a particular case." Id. at 1730. Thus, that precedent provides no reason for us to depart from Eulitt's holding as to animus.

## C.

In sum, as in Eulitt, we have once again considered our prior precedent upholding the "nonsectarian" requirement against a free exercise challenge with the aid of fresh precedent from the Supreme Court. But, due to the nature of the restriction at issue and the nature of the school aid program of which it is a key part, we conclude, once again, that the "nonsectarian" requirement does not violate the Free Exercise Clause. We thus turn our attention to the plaintiffs' other federal constitutional challenges.

## IV.

First up is the plaintiffs' contention that the "nonsectarian" requirement violates the Free Speech Clause of the First Amendment. Reviewing de novo, see United States v. Floyd, 740 F.3d 22, 38 (1st Cir. 2014), we see no merit to it.

The barrier here is Eulitt. As we explained there, Maine's tuition assistance program "deals with the provision of

secular secondary educational instruction to its residents; it does not commit to providing any open forum to encourage diverse views from private speakers." 386 F.3d at 356; see also id. (explaining that "[c]onsequently, cases dealing with speech fora -- such as Rosenberger v. Rector & Visitors of Univ. of Va., 515 U.S. 819 (1995) . . . -- are not relevant"). Given that the plaintiffs point to no post-Eulitt developments that call it into question, that prior precedent of ours controls here.

**V.**

We next consider the plaintiffs' equal protection challenge, which is based on the alleged religious discrimination that the "nonsectarian" requirement effects. Again reviewing de novo, see Floyd, 740 F.3d at 38, we conclude that here as well Eulitt stands in the way.

Eulitt explained that where a "challenged program comports with the Free Exercise Clause, that conclusion wraps up the religious discrimination analysis," such that "any further equal protection inquiry" need pass only rational basis review. 386 F.3d at 354 (citing Locke, 540 U.S. at 720 n.3; and Johnson v. Robison, 415 U.S. 361, 375 n.14 (1974)).[13] Neither Espinoza nor

_____

[13] To the extent that the resolution of a free exercise claim determines the level of scrutiny applied to the equal protection challenge only insofar as the asserted equal protection violation is rooted in the implication of a fundamental right, we note, as we did in Eulitt, the "hopelessness of any effort to suggest that those who choose to send their children to religious schools

- 55 -

Trinity Lutheran addressed the equal protection claims the plaintiffs there presented, Espinoza, 140 S. Ct. at 2263 n.5; Trinity Lutheran, 137 S. Ct. at 2024 n.5, and so Eulitt controls on that point.

In addition, even though the Eulitt plaintiffs conceded that their equal protection claim would fail if rationality review applied, Eulitt did suggest that the rational basis test was easily satisfied. 386 F.3d at 356. Thus, the plaintiffs need to explain why that conclusion is not decisive here. To do so, they invoke the Supreme Court's decision in Romer v. Evans, 517 U.S. 620 (1996), and the Ninth Circuit's decision in Christian Science Reading Room Jointly Maintained v. City & County of San Francisco, 784 F.2d 1010 (9th Cir. 1986). But, neither case is on point.

Romer held that Colorado's proffered rationales for a sweeping state constitutional amendment that denied persons protection based on their being "homosexual" were "so far removed" from the breadth of the provisions that it was "impossible to credit" them. 517 U.S. at 624, 635. Here, however, the link between the state interest and the "nonsectarian" requirement is clear given the state's interest -- rooted in its state constitution -- in making the benefits of a free public education available.

---

comprise a suspect class," 540 F.3d at 353 n.3; see also Johnson, 415 U.S. at 375 n.14.

Christian Science Reading Room also offers no help to the plaintiffs. There, the Ninth Circuit analyzed the San Francisco Airport Commission's decision to terminate the tenancy of a religious organization under rational basis review. 784 F.2d at 1010, 1012-13. It found that the policy could not be said to "further[] the governmental purpose in any way" where it had been adopted to remedy an Establishment Clause violation that did not actually exist. Id. at 1016.

But, even if we were to assume that any perceived Establishment Clause violation would be similarly illusory here, "a classification 'must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.'" Heller v. Doe, 509 U.S. 312, 320 (1993) (quoting FCC v. Beach Commc'ns, 508 U.S. 307, 313 (1993)). Thus, in challenging the statute, the plaintiffs "must negate every plausible basis that conceivably might support it." Boivin v. Black, 225 F.3d 36, 44 (1st Cir. 2000).

Eulitt, however, identified multiple rationales -- all consonant with Maine's interest in ensuring that the public's funds go to support only the rough equivalent of a public education -- for the "nonsectarian" requirement in the course of explaining why the plaintiffs' concession that their equal protection claim would fail under rational basis review was "understandable":

> [T]he legislative history clearly indicates Maine's reasons for excluding religious schools from education plans that extend public funding to private schools for the provision of secular education to Maine students. These reasons include Maine's interests in concentrating limited state funds on its goal of providing secular education, avoiding entanglement, and allaying concerns about accountability that undoubtedly would accompany state oversight of parochial schools' curricula and policies.

386 F.2d at 356. Yet, rather than address (much less negate) any of these purposes, the plaintiffs contend that the adoption of the "nonsectarian" requirement was based only on the state's "erroneous belief that the Establishment Clause required it to do so." See Christian Science Reading Room, 784 F.2d at 1013; see also id. at 1013 n.2 ("[A] court should not consider a hypothesized purpose if it is clear that 'the asserted purpose could not have been a goal of the [policy].'" (alteration in original) (quoting Weinberger v. Wisenfeld, 420 U.S. 636, 648 n.16 (1975))).

But, we cannot conclude -- and the plaintiffs do not explain how we could -- that the other rationales for the "nonsectarian" requirement that Eulitt found present in the legislative history "could not have been a goal of the legislation," Weinberger, 420 U.S. at 648 n.16. Thus, the plaintiffs' equal protection challenge necessarily fails. See Eulitt, 386 F.3d at 356 (explaining that under rational basis scrutiny, "the appellants bear the burden of demonstrating that

there exists no fairly conceivable set of facts that could ground a rational relationship between the challenged classification and the government's legitimate goals").

## VI.

That leaves only the plaintiffs' contention that the Establishment Clause requires Maine to include sectarian schools in the tuition benefit program. Our review is, again, de novo. See Floyd, 740 F.3d at 38.

The plaintiffs assert that § 2951(2) violates the Establishment Clause by excessively entangling the state with religion, see Lemon v. Kurtzman, 403 U.S. 602, 612-13 (1971), as it requires "government officials to engage in detailed inquiries of private schools to determine the 'religiosity' of private schools that seek approval for tuition purposes." Appellants' Br. at 38-39.

The chief problem for the plaintiffs is that none of the authority that they rely on indicates that the Establishment Clause requires the extension of a benefit to include religious uses in the absence of any finding of religious discrimination. In fact, Strout noted that "[t]here is no relevant precedent for using [the Establishment Clause's] negative prohibition [against making a law respecting the establishment of any religion] as a basis for extending the right of a religiously affiliated group to secure

state subsidies," 178 F.3d at 64, and the plaintiffs identify no supportive post-Strout authority.

The plaintiffs do cast post-Strout cases like Zelman as if they stand for the proposition that the Establishment Clause demands such inclusion. But, those cases merely rejected attempts to use that Clause as a sword. See, e.g., Zelman, 536 U.S. at 649-55. They do not support the claim that a requirement that otherwise permissibly limits the scope of a benefit to secular uses gives rise to an Establishment Clause violation just because it triggers an inquiry into whether a proposed use of that benefit would be secular. Cf. Lukumi, 508 U.S. at 532 (holding that, although "Establishment Clause cases . . . have often stated the principle that the First Amendment forbids an official purpose to disapprove of a particular religion or of religion in general," it is the "Free Exercise Clause [that] is dispositive" when what is at issue is not a "governmental effort[] to benefit religion or particular religions" but rather "an attempt to disfavor . . . religion").

In any event, the record demonstrates that schools seeking to be "approved" generally self-identify as "sectarian" or "nonsectarian," and the Commissioner explained that "if there is ever a question, the determination of whether a school is secular could readily be made by looking at objective factors such as mandatory attendance at religious services and course curricula."

And, consistent with that conclusion, the plaintiffs point only to two instances in which the Department inquired into the ways private schools other than BCS or TA seeking to be "approved" for tuition purposes incorporated religious training. Given that the inquiry is undertaken for purposes of ensuring the educational instruction provided by an applicant will mirror the secular educational instruction provided at Maine's public schools, such evidence cannot suffice to supply evidence of the kind of entanglement that could rise to the level of an Establishment Clause violation in this context, if any could. See Santa Fe Indep. Sch. Dist. v. Doe, 530 U.S. 290, 314 (2000) (concluding that it was proper to consider "whether the statute has an unconstitutional purpose," in addition to focusing on the application of the statute, in "Establishment Clause cases involving facial challenges"); Tilton v. Richardson, 403 U.S. 672, 687 (1971) (noting that entanglement concerns are lessened where there is less risk that "government aid will in fact serve to support religious activities"). Nor, finally, do the plaintiffs assert any entanglement concern as applied to them specifically, which is no surprise as neither TA nor BCS has yet applied to be "approved" to receive tuition assistance.

The plaintiffs do separately contend that the "nonsectarian" requirement "establish[es] a 'religion of secularism' in the sense of affirmatively opposing or showing

hostility toward religion." Appellants' Br. at 37 (quoting Schempp, 374 U.S. at 225). But, any family in Maine that prefers a sectarian education for their children to the secular one Maine provides as a public option can pay the tuition for their child to receive such an education. So, because that public educational option may be secular, this contention also goes nowhere. Thus, for this reason as well, the plaintiffs' Establishment Clause challenge fails.

## VII.

Maine's Constitution instructs the state's legislature to ensure that its local institutions have the means to provide the benefits of a free public education to their children. There is no question that Maine may ensure that such a public education is a secular one, just as there is no question that the Free Exercise Clause ensures that Mainers, like all Americans, are free to opt for a religious education for their children if they wish.

The difficulty Maine confronts is that many of its localities cannot feasibly provide the benefits of that free public education directly to their residents. Thus, Maine has had to adapt to that reality. In doing so, it has chosen to provide -- while still ensuring that any parent in Maine may send their child to a religious school at their own expense -- tuition assistance for those children who live in localities that operate no public

secondary school of their own to attend a private school that will provide a substitute for what they cannot get from the government.

In conditioning the availability of that assistance on the requirement that recipients use it for educational instruction that is as nonsectarian in content as the free public education that is not directly available to them, Maine transgresses neither the Free Exercise Clause nor the Establishment Clause, nor any of the other provisions of the federal Constitution that the plaintiffs invoke. Rather, it permissibly satisfies a commitment, rooted in its own founding charter, to pursue the wholly legitimate end of ensuring the distribution of the benefits of a free public education even to those who happen to live in places that cannot provide it of their own accord.

The judgment of the District Court is **affirmed**.