# United States Court of Appeals
## For the First Circuit

No. 20-1158

HAROLD SHURTLEFF and CAMP CONSTITUTION, a public charitable
trust,

Plaintiffs, Appellants,

v.

CITY OF BOSTON and GREGORY T. ROONEY, in his Official Capacity
as Commissioner of the City of Boston Property Management
Division,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Denise J. Casper, U.S. District Judge]

Before

Lynch, Selya, and Lipez,
Circuit Judges.

Mathew D. Staver, with whom Horatio G. Mihet, Roger K. Gannam,
Daniel J. Schmid, and Liberty Counsel were on brief, for
appellants.
Robert Arcangeli, Assistant Corporation Counsel, with whom
Eugene L. O'Flaherty, Corporation Counsel, was on brief, for
appellees.
Alex J. Luchenitser, Richard B. Katskee, Patrick Grubel,
Steven M. Freeman, David L. Barkey, Amy E. Feinman, Cindy Nesbit,
and Monica Miller on brief for Americans United for Separation of
Church and State; Anti-Defamation League; American Humanist
Association; Central Conference of American Rabbis; Covenant
Network of Presbyterians; Global Justice Institute; Hindu American

Foundation; Maine Conference, United Church of Christ; Men of Reform Judaism; Methodist Federation For Social Action; National Council of Jewish Women; New Hampshire Conference, United Church of Christ; People for the American Way Foundation; Reconstructionist Rabbinical Association; The Sikh Coalition; Southern New England Conference, United Church of Christ; Union for Reform Judaism; and Women of Reform Judaism, amici curiae.

January 22, 2021

**SELYA**, __Circuit Judge__.  This case comes before us for a second time, albeit in a different posture.  The issues are much the same, though presented in sharper focus on a better-developed record.  As such, they conjure up what might be described, in a turn of phrase popularly attributed to Lawrence "Yogi" Berra, as a sense of "déjà vu all over again."[1]

The case has its genesis in a suit filed by plaintiffs Harold Shurtleff and Camp Constitution in which they complained that the defendants — the City of Boston and Gregory T. Rooney, in his official capacity as Commissioner of Boston's Property Management Department (collectively, the City) — trampled their constitutional rights by refusing to fly a pennant, openly acknowledged by the plaintiffs to be a "Christian Flag," from a flagpole at Boston City Hall.  The district court granted summary judgment in favor of the City.  See Shurtleff v. City of Bos. (Shurtleff III), No. 18-CV-11417, 2020 WL 555248, at *6 (D. Mass. Feb. 4, 2020).  Concluding, as we do, that the government speech doctrine bars the maintenance of the plaintiffs' free speech claims and that their remaining claims under the Establishment Clause and the Equal Protection Clause lack bite, we affirm.

---

[1] We say "popularly attributed to" because at least one scholar has declared that "although this [phrase] is commonly cited as a 'Berra-ism,' Yogi Berra denies ever saying it."  Ralph Keyes, "Nice Guys Finish Seventh": False Phrases, Spurious Sayings, and Familiar Misquotations 152 (1992).

## I. BACKGROUND

We begin by rehearsing the relevant facts (most of which are undisputed, though the inferences from them are not) and the travel of the case.  The City owns and manages three flagpoles in an area in front of City Hall referred to as City Hall Plaza.  The three flagpoles are each approximately eighty-three feet tall and are prominently located in front of the entrance to City Hall — the seat of Boston's municipal government.  Ordinarily, the City raises the United States flag and the POW/MIA flag on one flagpole, the Commonwealth of Massachusetts flag on the second flagpole, and its own flag on the third flagpole.  Upon request and after approval, though, the City will from time to time replace its flag with another flag for a limited period of time.

Such requests are typically made by a third party in connection with an event taking place within the immediate area of the flagpoles.  In welcoming these third-party banners, the City's website proclaims that the City seeks to "commemorate flags from many countries and communities at Boston City Hall Plaza during the year" (emphasis in original).  The opportunity to display these kinds of flags was created in order to establish "an environment in the City where everyone feels included, . . . to raise awareness in Greater Boston and beyond about the many countries and cultures around the world[, and] to foster diversity and build and strengthen connections among Boston's many communities."

- 4 -

In addition to these flag-raisings, the City also allows organizations to hold events in several locations near City Hall. Endeavoring to educate those who may be interested in hosting such an event, the City has published event guidelines on its website. The guidelines make clear that people need the City's permission to hold events at City-owned properties and direct interested parties to an application form.

The application form (which is available either online or as a document) allows applicants to designate the location at which they wish to hold an event, listing six options: Faneuil Hall, Sam Adams Park, City Hall Plaza, the City Hall Lobby, the City Hall Flag Poles, and the North Stage. Although those interested in hosting a flag-raising event must submit an application form, neither the electronic nor the written version of the form mentions the option of raising a flag on any of the City's three flagpoles.

Once the City receives an application, its policy and practice are to perform an initial review. The purpose of this review is in part to ensure that there are no conflicting events occupying the same space, that the application is complete and accurately describes the proposed event, that the event would not endanger the public, and that other administrative requirements have been satisfied.

The obligation to review and act upon applications falls into Rooney's domain. Before a flag-raising event is approved, Rooney must determine that the City's decision to raise a flag is consistent with the City's message, policies, and practices. Each applicant submits a short description of the flag that it wishes to hoist (e.g., "Portuguese Flag"), and it is Rooney's invariable practice to act upon the flag-raising request without seeing the actual flag. The record makes manifest that Rooney has never sought to look at a flag before approving an application. If Rooney concludes that the event meets the City's standards, he then approves the flag-raising event. And if a flag-raising event is disapproved, the City offers the applicant the opportunity to hold the proposed event, without the flag-raising, either at City Hall Plaza or at some other location.

In a twelve-year period (from June 2005 through June 2017), the City approved 284 flag-raising events that implicated its third flagpole. These events were in connection with ethnic and other cultural celebrations, the arrival of dignitaries from other countries, the commemoration of historic events in other countries, and the celebration of certain causes (such as "gay pride"). The City also has raised on its third flagpole the flags of other countries, including Albania, Brazil, Ethiopia, Italy, Panama, Peru, Portugal, Mexico, as well as China, Cuba, and Turkey. So, too, it has raised the flags of Puerto Rico and private

organizations, such as the Chinese Progressive Association, National Juneteenth Observance Foundation, Bunker Hill Association, and Boston Pride. Broadly speaking, we group these approvals as approvals for "the flags of countries, civic organizations, or secular causes."

Against this backdrop, we introduce the plaintiffs. Camp Constitution is an all-volunteer association that seeks "to enhance understanding of the country's Judeo-Christian moral heritage." Shurtleff is the founder and director of Camp Constitution. In July of 2017, the plaintiffs emailed Lisa Menino, the City's senior special events official, seeking leave to fly their own flag over City Hall Plaza. In their words, the proposed event would "raise the Christian Flag" and feature "short speeches by some local clergy focusing on Boston's history."

At the time of this request, the City had no written policy for handling flag-raising applications. What is more, Rooney had never before denied a flag-raising application. On this occasion, though, the plaintiffs' request "concerned" Rooney because he considered it to be the first request he had received related to a religious flag.

Of course, some of the flags that the City had raised contained religious imagery. The Portuguese flag, for instance, contains "dots inside blue shields represent[ing] the five wounds of Christ when crucified" and "thirty dots that represent[] [sic]

the coins Judas received for having betrayed Christ." As another example, the Turkish flag situates the star and crescent of the Islamic Ottoman Empire in white against a red background. Indeed, the City's own flag includes a Latin inscription, which translates as "God be with us as he was with our fathers." None of the flags that the City had previously approved, however, came with a religious description.

Mulling the plaintiffs' application, Rooney conducted a review of past flag-raising requests and determined that the City had no past practice of flying a religious flag. He proceeded to deny the plaintiffs' flag-raising request. In response to the plaintiffs' inquiry into the reason for the denial, Rooney responded that the City's policy was to refrain respectfully from flying non-secular third-party flags in accordance with the First Amendment's prohibition of government establishment of religion. Rooney offered to fly some non-religious flag instead. The plaintiffs spurned this offer.

In September of 2017, Shurtleff once again requested permission for a flag-raising event at City Hall Plaza. This time, he submitted a flag-raising application that titled the event as "Camp Constitution Christian Flag Raising." The event, which was intended to "[c]elebrate and recognize the contributions Boston's Christian community has made to our city's cultural diversity, intellectual capital and economic growth," would feature three

- 8 -

speakers: Reverend Steve Craft (who would speak on the need for racial reconciliation), Pastor William Levi (who would speak on "the blessings of religious freedom in the U.S."), and Shurtleff himself (who would present a Boston-centric historical overview). Believing that its response to the plaintiffs' first flag-raising request was self-explanatory, the City chose not to respond further.

About a year later, the City embodied its past policy and practice in a written Flag Raising Policy. This policy includes seven flag raising rules, the first of which forbids the "display [of] flags deemed to be inappropriate or offensive in nature or those supporting discrimination, prejudice, or religious movements."

On July 6, 2018 — roughly three months before the City adopted its written Flag Raising Policy — the plaintiffs sued the City in the federal district court, seeking injunctive relief, a declaratory judgment, and money damages. Three days later, they moved for a preliminary injunction. The district court denied the plaintiffs' motion, see Shurtleff v. City of Bos. (Shurtleff I), 337 F. Supp. 3d 66 (D. Mass. 2018), and we affirmed, see Shurtleff v. City of Bos. (Shurtleff II), 928 F.3d 166 (1st Cir. 2019). Back in the district court, the parties conducted discovery and eventually cross-moved for summary judgment. The district court heard arguments and, in a comprehensive rescript, granted the

City's motion and denied the plaintiffs' cross-motion.  See Shurtleff III, 2020 WL 555248, at *6.  This timely appeal followed.

**II. ANALYSIS**

The plaintiffs assign error to the district court's grant of summary judgment.  Specifically, they challenge the court's holding that the City's display of third-party flags on the City Hall flagpole constitutes government speech, not subject to most First Amendment restrictions.  In their view, the City's flagpoles comprise a public forum, thus consigning the City's content-based restriction of plaintiffs' speech to strict scrutiny (which they say the restriction cannot pass).  Relatedly, they contend that the City's permitting process for the raising of third-party flags vests in government officials unbridled discretion to approve and deny protected speech and, thus, imposes an unconstitutional prior restraint on speech.  Finally, they contend that the City's refusal to fly a religious flag transgresses both the Establishment Clause and the Equal Protection Clause.

The City urges us to reject each and all of these contentions and simply to affirm the district court's rulings.  It is joined by a group of amici, who have filed a helpful brief in support of the judgment below.

We afford de novo review to a district court's entry of summary judgment.  See Dávila v. Corporación De P.R. Para La

- 10 -

Difusión Pública, 498 F.3d 9, 12 (1st Cir. 2007). In conducting this tamisage, we assess the facts in the light most flattering to the nonmovants (here, the plaintiffs) and draw all reasonable inferences to their behoof. See id. Summary judgment is appropriate only when the record demonstrates that there is no genuine issue as to any material fact and confirms that the movants are entitled to judgment as a matter of law. See Morelli v. Webster, 552 F.3d 12, 18 (1st Cir. 2009). That cross-motions for summary judgment were simultaneously adjudicated by the district court does not alter the applicable standards of review. See Blackie v. Maine, 75 F.3d 716, 720-21 (1st Cir. 1996).

With these parameters in place, we turn to the plaintiffs' asseverational array, taking their arguments sequentially. At the outset, though, we pause to say a few words about the relevance of our earlier opinion (Shurtleff II).

## A. **Our Earlier Opinion**.

We think it useful to center our Shurtleff II opinion within the preliminary injunction framework. That framework anticipates a four-part inquiry, see Corp. Techs., Inc. v. Harnett, 731 F.3d 6, 9 (1st Cir. 2013); Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 15 (1st Cir. 1996), requiring a district court to evaluate "the movant's likelihood of success on the merits; whether and to what extent the movant will suffer irreparable harm in the absence of preliminary injunctive relief;

- 11 -

the balance of relative hardships, that is, the hardship to the nonmovant if enjoined as opposed to the hardship to the movant if no injunction issues; and the effect, if any, that either a preliminary injunction or the absence of one will have on the public interest," Ryan v. U.S. Immig. & Customs Enf't, 974 F.3d 9, 18 (1st Cir. 2020). Among these four factors, "[t]he movant's likelihood of success on the merits weighs most heavily in the preliminary injunction calculus." Id. As we have explained, "[i]f the movant 'cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity.'" Id. (quoting New Comm Wireless Servs., Inc. v. SprintCom, Inc., 287 F.3d 1, 9 (1st Cir. 2002)).

In Shurtleff I, the district court denied the plaintiffs' threshold motion for a preliminary injunction. See 377 F. Supp. 3d at 79. The court determined, among other things, that the plaintiffs had not shown a likelihood of succeeding on the merits of their claims. See id. at 78. On appeal, we affirmed this determination, concluding that the district court's appraisal was not an abuse of discretion. See Shurtleff II, 928 F.3d at 171.

The fact that Shurtleff II upheld the district court's determination that the plaintiffs were unlikely to prevail on the same claims that they now pursue is not determinative of either the issues that were before the district court in Shurtleff III or

- 12 -

the issues that confront us here.  There is, after all, a salient distinction between a decision granting or denying a preliminary injunction and a final decision on the merits (such as the entry of summary judgment).  At the preliminary injunction stage, "an inquiring court need not conclusively determine the merits of the movant's claim; it is enough for the court simply to evaluate the likelihood vel non that the movant ultimately will prevail on the merits."  Ryan, 974 F.3d at 18.

Here, however, the appealed decision is one on the merits.  In Shurtleff III, the district court had to determine whether the City had shown that there were no genuine issues of material fact and, if so, that it was entitled to judgment as a matter of law.  See Morelli, 552 F.3d at 18.  Moreover, the court had to make this determination on a record that was considerably better developed than the record available to it at the preliminary injunction stage.  See Univ. of Tex. v. Camenisch, 451 U.S. 390, 395-96 (1981).  Thus, our decision in Shurtleff II, which was at most a validation of the district court's prediction of probable outcomes, see Jimenez Fuentes v. Torres Gaztambide, 807 F.2d 236, 238 (1st Cir. 1986), could inform the district court's subsequent summary judgment decision but could not control it, see Univ. of Tex., 451 U.S. at 395.

Shurtleff II relates to the current appeal in the same way.  That decision, therefore, does not determine the outcome of this merits appeal.  See id.  We proceed accordingly.

## B.  **The Free Speech Claims**.

The plaintiffs' most loudly bruited argument is that the Free Speech Clause of the First Amendment does not permit the City to display a plethora of third-party flags in front of City Hall while refusing to display the Christian Flag proffered by the plaintiffs.  The district court determined that this group of claims was foreclosed by the government speech doctrine, see Shurtleff III, 2020 WL 555248, at *5, and so do we.

The proposition that the plaintiffs' free speech claims rise or fall on the classification of the challenged speech is uncontroversial.  Even though the First Amendment restricts government regulation of private speech in government-designated public forums, such restrictions do not apply to government speech. See Pleasant Grove City v. Summum, 555 U.S. 460, 467 (2009) ("The Free Speech Clause restricts government regulation of private speech; it does not regulate government speech."); Walker v. Tex. Div., Sons of Confederate Veterans, Inc., 576 U.S. 200, 215 (2015) ("[When] the State is speaking on its own behalf, the First Amendment strictures that attend the various types of government-established forums do not apply.").  Here, the classification of the speech in question is pivotal — but before attempting to

resolve this classification inquiry, we map the relevant contours of the government speech doctrine.

Two cases chiefly inform the configuration of this map. In Summum, the Supreme Court considered whether "the Free Speech Clause of the First Amendment entitles a private group to insist that a municipality permit it to place a permanent monument in a city park in which other donated monuments were previously erected." 555 U.S. at 464. The respondent, a religious organization, sought leave from the city to erect a monument that would contain "the Seven Aphorisms of SUMMUM," which the respondent said would be similar "in size and nature to the Ten Commandments monument" then in place at the city park. Id. at 465. The city denied the respondent's request, and the respondent sued (alleging an abridgment of the right to free speech). See id. at 465-66. The Court upheld the city's decision, ruling that because the display of "a permanent monument in a public park . . . is best viewed as a form of government speech," such a display is "not subject to scrutiny under the Free Speech Clause." Id. at 464.

In determining that the placement of such a monument in a city-owned park constituted government speech, the Summum Court relied primarily on three factors. First, the Court focused on the history of governmental use of monuments, explaining that "[g]overnments have long used monuments to speak to the public" and that "[w]hen a government entity arranges for the construction

- 15 -

of a monument, it does so because it wishes to convey some thought or instill some feeling in those who see the structure." Id. at 470. Second, the Court considered whether the message conveyed by the monuments would be ascribed to the government. Id. at 471. The Court concluded that, in the city-park context, "there is little chance" that observers will fail to identify the government as the speaker. Id. Third, and finally, the Court considered the fact that the municipality "effectively controlled" the messages sent by the monuments because it exercised "final approval authority over their selection." Id. at 473. Giving weight to these factors, the Court determined that the erection of privately donated monuments in a city park constituted government speech. See id. at 472-73.

A few years later, the Court revisited the government speech doctrine. In Walker, the issue was whether the rejection of a "specialty license plate design featuring a Confederate battle flag" by the Texas Department of Motor Vehicles "violated the Constitution's free speech guarantees." 576 U.S. at 203-04. Concluding that specialty license plates convey government speech, the Court held that Texas was "entitled to refuse to issue plates" that featured the proffered design. Id. at 219-20. In reaching this conclusion, the Court again employed the three-factor test developed in Summum.

The Walker Court began by examining the history of the use of the medium by the government, then inquired into how closely the public identified the medium with the government, and went on to assay the degree of control the government maintained over the message conveyed. See id. at 210-13. In traveling down this path, the Court first found that license plates "long have communicated messages from the States." Id. at 211. Next, it found that the public reasonably interprets license plates as conveying a message on the state's behalf both because the plates bear "the name 'TEXAS' in large letters" and because the state mandates vehicle owners to display the plate, owns all license plate designs, and dictates the manner in which vehicle owners may dispose of the plates. Id. at 212. Finally, the Court found that the state "effectively controlled" the messages conveyed on the license plates because it retained "final approval authority." Id. at 213. These three factors, taken together, led inexorably to the conclusion that the challenged speech constituted government speech. See id.

The three-part Summum/Walker test is controlling here. Mindful that the Court has indicated that Walker "likely marks the outer bounds of the government-speech doctrine," Matal v. Tam, 137 S. Ct. 1744, 1760 (2017), we turn to whether the speech at issue falls within those bounds.

We start by looking at the historical use of flags by the government. The parties do not gainsay that governments have used flags throughout history to communicate messages and ideas. See, e.g., W. Va. State Bd. of Educ. v. Barnette, 319 U.S. 624, 632 (1943) ("The use of an emblem or flag to symbolize some system, idea, institution, or personality, is a short cut from mind to mind."); Griffin v. Sec'y of Veterans Affs., 288 F.3d 1309, 1324 (Fed. Cir. 2002) ("We have no doubt that the government engages in speech when it flies its own flags over a national cemetery, and that its choice of which flags to fly may favor one viewpoint over another."). Flags themselves have the capacity to communicate messages pertaining to, say, a government's identity, values, or military strength. See Shurtleff II, 928 F.3d at 173 n.4. Cf. Summum, 555 U.S. at 470 ("Governments have long used monuments . . . to remind their subjects of their authority and power[,] . . . to commemorate military victories and sacrifices and other events of civic importance [or] to convey some thought or instill some feeling in those who see the structure."). That a government flies a flag as a "symbolic act" and signal of a greater message to the public is indisputable. See Shurtleff II, 928 F.3d at 173.

With respect to the issue of whether an observer would attribute the message of a third-party flag on the City's third flagpole to the City, we found it likely the last time around that such an attribution would take place. See id. The record has

- 18 -

since evolved, and these evolutionary changes bolster our earlier conclusion. As we previously noted, an observer would arrive in front of City Hall, "the entrance to Boston's seat of government." Id. at 174. She would then see a city employee replace the city flag with a third-party flag and turn the crank until the third-party flag joins the United States flag and the Massachusetts flag, both "powerful governmental symbols," in the sky (eighty-three feet above the ground). Id. A faraway observer (one without a view of the Plaza) would see those three flags waiving in unison, side-by-side, from matching flagpoles.

That the third-party flag is part of a broader display cannot be understated. As the Summum Court explained, the manner in which speech is presented, including the incorporation of other monuments in the vicinity, changes the message communicated. See 555 U.S. at 477. Here, the three flags are meant to be — and in fact are — viewed together. The sky-high City Hall display of three flags flying in close proximity communicates the symbolic unity of the three flags. It therefore strains credulity to believe that an observer would partition such a coordinated three-flag display (or a four-flag display if one counts the POW/MIA flag) into a series of separate yet simultaneous messages (two that the government endorses and another as to which the government disclaims any relation). Cf. Summum, 555 U.S. 471 ("It certainly is not common for property owners to open up their property for

- 19 -

the installation of permanent monuments that convey a message with which they do not wish to be associated."). Although the plaintiffs might perhaps make the case that a lone Christian Flag, nowhere near City Hall, would be seen as devoid of any connection to a government entity, a City Hall display that places such a flag next to the flag of the United States and the flag of the Commonwealth of Massachusetts communicates a far different message to an observer: that the City flies all three flags.

The plaintiffs demur, insisting that an observer, in these circumstances, would not interpret a third-party flag as a message from the City. This demurrer is premised on the notion that the question of whether expression is likely to be viewed as government speech must be answered from the viewpoint of a "reasonable and informed" observer. Building to a crescendo, the plaintiffs posit that a reasonable and informed observer not only would see the flag, but also would take note of the intricacies of the administrative process leading up to its display. Stripped of rhetorical flourishes, the plaintiffs ask us to consider the perspective of an observer who — in their words — knows:

> (1) that the City's open invitation policy and practice "seeks to accommodate all applications seeking to take advantage of the City of Boston's public forums" . . .; (2) that the City permits private organizations

temporarily to raise their flags . . . as a "substitute" for the government's flag; (3) that the City has approved at least <u>284 flag raising events</u> . . .; (4) that during the year preceding Camp Constitution's application the City approved an average of over three flag raisings per month; (5) that prior to Camp Constitution's application, flag raising denials were exceedingly rare, and that Rooney <u>had never denied a flag raising request</u>; (6) that the City will allow essentially any event to take place on City Hall Plaza; and (7) that the City does not even review the content of the substitute flags . . . (emphasis in original).

Relatedly, the plaintiffs insist that the messages of the third-party flags cannot be attributed to the City because "Rooney swore he had no knowledge of anyone's ever believing the City has endorsed or adopted the message of a private organization that was allowed access to the flag raising forum." An observer armed with this information, the plaintiffs say, would not attribute the third-party-flag speech to the City.

The plaintiffs' conception of a "reasonable and informed" observer is not plucked from thin air. Justice Souter,

- 21 -

concurring in Summum, advocated for a standard based on the reaction of a "reasonable and fully informed observer."  555 U.S. at 487 (Souter, J., concurring).  The Court did not explicitly adopt this standard, but has nonetheless focused on the physical attributes of the speech and general information about the locus at which the speech takes place.  In Summum, for example, the Court considered what "persons who observe" such monuments see, id. at 471, and added that most people know that parks are government property, id. at 472 ("Public parks are often closely identified in the public mind with the government unit that owns the land."). So, too, the Walker Court considered the physical attributes of the speech visible to "persons who observe" license plates, 576 U.S. at 212 ("The governmental nature of the plates is clear from their faces . . . ."), as well as widely available information about license plates, id. ("[T]he State requires Texas vehicle owners to display license plates, and every Texas license plate is issued by the State . . . .  Texas also owns the designs on its license plates . . . .  And Texas dictates the manner in which drivers may dispose of unused plates.").  The City's treatment of third-party flags satisfies the standard that the Supreme Court has set for attribution:  an observer not only would see the third-party flag flying with two government flags in front of a building labeled "Boston City Hall" but also would reason that the building

is a government building and that the imposing flagpoles located on that property are owned and dressed by the City.[2]

The plaintiffs have another string to their bow. They argue that the Summum/Walker framework is inapplicable because the third-party flags that the City flies lack the permanence of the monuments in Summum. We rejected this same argument in Shurtleff II, 928 F.3d at 175, and the plaintiffs have advanced no compelling reason for us to revisit the matter. To our way of thinking, the decisive datum is that the Walker Court explicitly disavowed any suggestion that permanence is a prerequisite for finding government speech. See 576 U.S. at 213-14.

We turn next to the question of whether the City maintains control over the messages conveyed by the third-party

---

[2] We add, moreover, that even if we were prepared to adopt a "reasonable and informed observer" standard, such a standard would be satisfied here. See Shurtleff II, 928 F.3d at 173 n.5. It is the manner and circumstances in which a third-party flag is displayed, together with the logical inferences that a reasonable and informed observer would likely draw based on available information, that lead to a conclusion that the third-party-flag speech can be attributed to the government.

Relatedly, Justice Souter's concurrence in Summum warned primarily against the deployment of categorical rules in determining what constitutes government speech. Summum, 555 U.S. at 487 (Souter, J., concurring). Contrary to the plaintiffs' formulation of the "reasonable and informed observer" standard, neither Justice Souter's concurrence nor any other cited opinion has suggested that such an observer would necessarily know things like the City's regulations for flag-raising or the decisionmaking trends of a specific government employee. Absent any vestige of precedential support, we decline the plaintiffs' invitation to adopt and apply a newly minted standard.

- 23 -

flags. The City has instituted procedures to ensure both that it is aware of all flags flown and that such flags display approvable messages. It is undisputed that "[i]nterested persons and organizations must apply to the City for a permit before they can raise a flag on this flagpole," and that the flag-raising guidelines expressly require the City's permission to fly a third-party flag. Shurtleff II, 928 F.3d at 174. And in order for a flag-raising request to secure approval, Rooney must review the request to determine whether the proposed flag-raising is consistent with the City's message, policies, and practices. Cf. Summum, 555 U.S. at 472 (finding government speech when "[g]overnment decisionmakers select the monuments that portray what they view as appropriate for the place in question, taking into account such content-based factors as esthetics, history, and local culture"); Walker, 576 U.S. at 213 (finding control when "[t]he Board must approve every specialty plate design proposal before the design can appear on a Texas plate").

What is more, the City limits physical access to the flagpole: the flagpole is restricted government property, and the City restricts access to it by providing only parties whose requests are approved with a hand crank. All in all, the decision to fly a flag falls squarely on the City, and not on any other entity or person. This final approval authority means that when a third-party flag flies over City Hall, it flies only because the

City chose to fly it. And in reserving this final approval authority, the City "has 'effectively controlled' the messages conveyed" in the flag display. Id. (quoting Johanns v. Livestock Mktg. Ass'n, 544 U.S. 550, 560 (2005)).

The plaintiffs argue that the type of government practices that led the Court in Summum and Walker to find government control are not present here. They note, for example, that the Summum Court observed that the government "took ownership of [the] monument" and that "[a]ll rights previously possessed by the monument's donor [were] relinquished." 555 U.S. at 473-74. They also note that, in Walker, the state owned the designs that were on all specialty license plates, issued all state plates, and dictated how a driver may dispose of a plate. 576 U.S. at 212. Here, by contrast, the City does not require a private organization that seeks to raise a flag to surrender ownership of that flag, nor does it require that a flag bear any particular design or logo.

This argument lacks force. The government's ownership of a monument or a design are relevant to the "attribution" prong of the Summum/Walker test — not to the "control" prong. See Walker, 576 U.S. at 212; Summum, 555 U.S. at 473-74. The latter prong instead turns on whether the government "effectively control[s]" the message conveyed through selection. See Summum, 555 U.S. at 473 (quoting Johanns, 544 U.S. at 560-61). The City's

final approval authority over all third-party flags evinces choice and selection and, thus, suffices to show effective control.

Struggling to undermine the finding of control, the plaintiffs highlight three pieces of evidence uncovered during pretrial discovery (and not available at the preliminary injunction stage): first, until the plaintiffs came along, the City had not previously denied a flag-raising request; second, Rooney's customary practice was not to ask to see a proposed flag before approving such a request; and third, although the preliminary injunction record previously noted only fifteen instances of flag-raisings, the expanded record reveals that the City had approved 284 requests. The plaintiffs submit that these freshly unearthed facts demonstrate that the City did not exercise meaningful control over the message conveyed by third-party flags. We do not agree.

We find the rate of rejection unpersuasive because the exercise of the authority to reject is necessarily case-specific and limited by the kinds of requests the City receives. Since the City had never rejected a request, the flag-raisings in the record are, in effect, a record of the requests received. Every request has been for the flag of a country, civic organization, or secular cause. That potential applicants have successfully self-selected and offered a narrow set of acceptable secular designs cannot be evidence that the City is open to fly any flag.

The limited kinds of unique flags and the repeated requests to fly the same flags also help to explain Rooney's practice. Some of the flags were no doubt familiar to him and, at any rate, a request to fly a flag includes a short description of the flag. Because Rooney recognizes the names of sovereign nations, because the City had seen most, if not all, of these flags in previous years, and because in twelve years no person had requested to fly anything that was not the flag of a country, civic organization, or secular cause, a short description of each proposed flag was sufficient for Rooney's purposes. But once Rooney received a request for a flag he did not recognize as falling within an acceptable secular category — the Christian Flag — he demanded that he see it.

The greater number of flag-raisings is likewise insufficient to ground a finding that the City does not control the flagpole. The Walker Court was clear that the number of flags — or messages — is not dispositive. 576 U.S. at 214. Here, the Walker's Court logic applies because the number of flags approved by the City is not evidence of universal access to the flagpole. After all, the group of third-party flags raised over City Hall during the twelve-year period is not a random assortment. Each flag represents a country, civic organization, or secular cause. Instead of evincing a lack of control, the greater number of flag-raisings reveals a pattern that supports the City's claim that it

approves only flags that it deems "consistent with the City's messages, policies, and practices."

In this context, the Supreme Court has not laid out an elaborate protocol for finding effective control. Broadly speaking, it is the City's "select[ion] [of] those [flags] that it wants to display for the purpose of presenting the image of the City that it wishes to project" that establishes City control over the message conveyed. Summum, 555 U.S. at 473. In the case at hand, Rooney's approval practices have not been shown to be a rubber stamp. There is nothing remarkable about the fact that some flag descriptions may trigger further review, while others do not. Wherever the line falls, that a line exists is evidence of "selective receptivity." See id. at 471. That selectivity exists here, and it is a selectivity born out of a concern for the City's image. The record, taken as a whole, plainly shows a city conscious of the message that it flies on the third flagpole and an accompanying selectivity to tailor that message to the City's desired image. See id. Accordingly, each of the three Summum/Walker factors supports the conclusion that the City engages in government speech when it decides which flags to display in front of City Hall.

The plaintiffs demur. They deride this classification of the City's speech, arguing vehemently that the City does not engage in expressive activity through these third-party flags

because it has designated the third flagpole as a forum for private speech.  In support, they offer two arguments.  First, the plaintiffs say that the City explicitly opened the flagpole to private expression.  Specifically, they point to the third page of the City's paper event application form, which states that the City "seeks to accommodate all applicants seeking to take advantage of the City of Boston's public forums."  The plaintiffs suggest that the phrases "all applicants" and "public forums" transmogrify the third flagpole into a government-designated public forum.  Second, and relatedly, the plaintiffs argue that the City implicitly opened the flagpole for public discourse because the record now shows that the City had granted flag-raising permission 284 times without ever denying an earlier request.

These two arguments coalesce into a single theme — but it is a theme that gains the plaintiffs no traction.  We previously rejected the first of these arguments because a conclusion that the City has designated the flagpole as a public forum "is precluded by our government-speech finding."  Shurtleff II, 928 F.3d at 175.  As we explain below, that rationale still withstands scrutiny — and even under traditional public-forum analysis, the plaintiffs' asseverational array lacks force.

The government creates a public forum "only by intentionally opening a nontraditional forum for public discourse."  Cornelius v. NAACP Legal Def. & Edu. Fund, Inc., 473

U.S. 788, 802 (1985). Government inaction or permission for limited discourse cannot establish a public-forum designation. Id. To determine if the City has converted the flagpole into a public forum, we look to the City's "policy and practice" and also may consider "the nature of the [flagpole] and its compatibility with expressive activity." Id. "We will not find that a public forum has been created in the face of clear evidence of a contrary intent," nor will we make such a finding "when the nature of the property is inconsistent with expressive activity." Id. at 804.

At the preliminary injunction stage, we rejected the plaintiffs' argument that the City's "public forum[]" incantation rendered the flagpole a public forum because the record contained clear evidence that the City did not intend to open the flagpole to public discourse. Shurtleff II, 928 F.3d at 176. On the enlarged record now before us — which shows that the City over time has approved 284 requests and has never denied any request other than the plaintiffs' request — our conclusion remains the same.

The record is pellucid that the City is not receptive to any and all proposed flag designs. As we previously indicated, the City controls which third-party flags are flown from the third flagpole. A flag-raising is approved only after Rooney "screen[s]" a proposed flag for "consisten[cy] with the City's message, policies, and practices" and provides his final approval. Id.;

cf. Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n, 460 U.S. 37, 47 (2001) (finding that school's mail system had not been designated as a public forum when school principal had to grant permission to access system). Furthermore, all 284 flags previously flown were flags of countries, civic organizations, or secular causes. That the City had not rejected prior requests is insufficient to conclude that the City accepts any and all flags because the record shows that the City had criteria for approval that limited flagpole access and that all flags flown satisfied those criteria. Cf. Cornelius, 473 U.S. at 804-05 (declining to find designated public forum notwithstanding lack of evidence showing how many organizations had been denied permission because admission criteria evidenced selective access). Here, the City's permission procedures evince selective access to the third flagpole, and "[t]he government does not create a designated public forum when it does no more than reserve eligibility for access to the forum to a particular class of speakers, whose members must then, as individuals, 'obtain permission.'" Ark. Edu. Television Comm'n v. Forbes, 523 U.S. 666, 679 (1998). The City's restrictions demonstrate an intent antithetic to the designation of a public forum, and those restrictions adequately support the conclusion that the City's flagpole is not a public forum. See Cornelius, 473 U.S. at 803.

That ends this aspect of the matter. Because the City engages in government speech when it raises a third-party flag on the third flagpole at City Hall, that speech is not circumscribed by the Free Speech Clause. See Walker, 576 U.S. at 215; Summum, 555 U.S. at 467. The City is therefore "entitled" to "select the views that it wants to express." Summum, 555 U.S. at 467-68 (internal citations omitted). This entitlement includes both the right to decide not to speak at all and the right to disassociate itself from speech of which it disapproves. See Mech v. Sch. Bd. of Palm Beach Cnty., 806 F.3d 1070, 1074 (11th Cir. 2015); Downs v. L.A. Unified Sch. Dist., 228 F.3d 1003, 1012 (9th Cir. 2000).

Here, the City exercised those rights by choosing not to fly the plaintiffs' third-party flag. In the City's view, this choice allows it more appropriately to celebrate the diversity and varied communities within Boston. Should the citizenry object to the City's secular-flag policy or to its ideas about diversity, the voters may elect new officials who share their concerns. See Summum, 555 U.S. at 468-69; Bd. of Regents of Univ. of Wisconsin Sys. v. Southworth, 529 U.S. 217, 235 (2000); Walker, 576 U.S. 200, 207. After all, it is the electorate and the political process that constrains the City's speech, not the Free Speech Clause. See Summum, 555 U.S. at 468-69. Consequently, we uphold the district court's entry of summary judgment in favor of the

City on all of the plaintiffs' free speech claims.[3]  See Shurtleff III, 2020 WL 555248, at *6.

### C.  The Establishment Clause Claim.

The fact that the City is engaging in government speech does not relieve it from the obligation to comport with the Establishment Clause.  Summum, 555 U.S. at 468.  The plaintiffs assert that the City has failed to satisfy this obligation for two reasons.  First, they assert that the City discriminated between religion and nonreligion by excluding their proffered flag while continuing to fly non-religious flags.  Second, they assert that the City discriminated between religions by excluding their Christian Flag while flying flags that contain other religious imagery.  As examples, the plaintiffs cite the City's own flag, the Turkish flag, the Portuguese flag, and the Bunker Hill flag. The City's conduct in this regard, the plaintiffs say, is not only discriminatory but also demonstrates hostility toward religion.

The "touchstone" for Establishment Clause claims "is the principle that the 'First Amendment mandates governmental

---

[3]  This ruling extends, of course, to the plaintiffs' "unbridled discretion" claim.  Both the plaintiffs' articulation of that claim and the authority that they present in support of it presuppose the existence of a public forum.  Our conclusion that the flagpole is not a public forum therefore defenestrates the plaintiffs' claim.  See Widmar v. Vincent, 454 U.S. 263, 267-68, 267 n.5 (1981) (noting that university's constitutional obligation to justify prior restraint on speech arises from its designation of its campus as public forum and would not exist otherwise).

neutrality between religion and religion, and between religion and nonreligion.'" McCreary Cnty. v. ACLU of Ky., 545 U.S. 844, 860 (2005) (quoting Epperson v. Arkansas, 393 U.S. 97, 104 (1968)). The government does not act neutrally when its "ostensible object is to take sides." Id. Accordingly, the government "cannot act in a manner that passes judgment upon or presupposes the illegitimacy of religious beliefs and practices." Masterpiece Cakeshop Ltd. v. Col. Civ. Rights Comm'n, 138 S. Ct. 1719, 1731 (2018).

Starting from this baseline, we turn first to the allegations of discrimination between religion and nonreligion. At the outset, we take note that the plaintiffs' Establishment Clause claim is scantily developed:  they have neither identified any evidence supporting a claim of hostility nor advanced any serious legal argument for such a claim. The plaintiffs merely recite the general neutrality obligation that the Establishment Clause imposes upon the City, failing to articulate any reason why this obligation requires the City to display their religious flag.[4]

---

[4] The plaintiffs' sparse treatment of their Establishment Clause claim suggests that this case, at its core, is not an Establishment Clause case. This suggestion is bolstered by the fact that the type of hostility argument conceptualized by the plaintiffs appears to draw its essence from Supreme Court decisions involving the Free Exercise Clause and applying the strict-scrutiny standard. See, e.g., Trinity Lutheran Church of Columbia, Inc. v. Comer, 137 S. Ct. 2012 (2017) (holding that exclusion of church from otherwise available public program on account of religious status violates Free Exercise Clause despite

- 34 -

The exclusion of religious entities from a public program, without more, does not violate the Establishment Clause. See Carson ex rel. O.C. v. Makin, 979 F.3d 21, 49 (1st Cir. 2020). Nor is proof of such exclusion evidence of hostility towards religion. See id. Here, moreover, the record does not give rise to any suggestion that the City created the flag-raising program with the goal of inhibiting religion. Cf. Rosenberger v. Rector & Visitors of Univ. of Va., 515 U.S. 819, 840 (1995) (finding governmental program to be "neutral toward religion" when government did not "create[] it to advance religion or adopt[] some ingenious device with the purpose of aiding a religious cause"); McCreary, 545 U.S. at 860 (requiring proof of government "purpose" to favor one side over the other). In fact, the City went the extra mile: to help avoid any such impression, it offered the plaintiffs the option of hosting an event alongside the flagpoles so as to permit the plaintiffs to continue to practice and share their religion (just as they would had the City granted their flag-raising request). Under these circumstances, the

government's establishment concerns); Espinoza v. Montana Dep't of Revenue, 140 S. Ct. 2246 (2020) (same where government excluded school based on religious character of the school). In the case at hand, the plaintiffs do not advance a cognizable free exercise claim but, rather, seek the application of a concept of hostility to religion not typically applied to Establishment Clause claims like this one. Seen in this light, the plaintiffs' theory fits awkwardly with precedent — an awkwardness that greatly diminishes the force of their claim.

City's conduct simply cannot be construed to suggest the disparagement of the plaintiffs' religion. Cf. Masterpiece Cakeshop, 138 S. Ct. at 1729 (finding hostility toward religion when government "disparage[d]" plaintiff's religion "by describing it as despicable," "characterizing it as merely rhetorical," and comparing it "to defenses of slavery and the Holocaust").

We add, moreover, that while the Establishment Clause may not require a secular-flag policy, the City "may act upon [its] legitimate concerns about excessive entanglement with religion" in administering its flag-raising program. Eulitt ex rel. Eulitt v. Maine, Dep't of Educ., 386 F.3d 344, 355 (1st Cir. 2004); see also Carson ex rel. O.C., 979 F.3d at 35. The City has presented just such a set of concerns in this case and, thus, has made a valid choice to remain secular. Shurtleff himself described the Christian flag as "an important symbol of our country's Judeo-Christian heritage." Should the City honor the plaintiffs' request, members of the audience would watch the Christian Flag join the flags of the United States and Massachusetts in front of the entrance of City Hall. Such a display could be deemed to constitute a religious statement on the City's part. Cf. Am. Jewish Cong. v. City of Chicago, 827 F.2d 120, 128 (7th Cir. 1987) (noting that placement of religious display at city hall heightens Establishment Clause concerns because "every display . . . is implicitly marked with the stamp of government approval"). And

such a perception would underscore the realistic nature of the City's belief that the flying of a flag would be an endorsement of the flag's message. See Widmar v. Vincent, 454 U.S. 263, 274 (1981) (evaluating whether government policy confers "any imprimatur of state approval on religious sects or practices").

Our government-speech finding bolsters the conclusion that the City would be perceived to endorse the messages conveyed by the flags that it flies. When a forum is open to all, it is doubtful that an observer "could draw any reasonable inference of [government] support" for a particular religion from religious speech alone. Id. at 274, 274 n.14. In such a situation, the City would not be seen as supporting religious goals. See id. Here, however, the City speaks for itself, one third-party flag at a time. Because an observer would attribute the display's message to the City, see supra Part II(B), the powerful display of a single religion's flag (in this case, an "important symbol" of the plaintiffs' religion) could signal the City's embrace of that religion.

To complete the picture, it is worth noting that the Supreme Court has explicitly distinguished the religious character of long-standing religious monuments, symbols, and practices from that of newly erected or adopted ones. See Am. Legion v. Am. Humanist Assoc., 139 S. Ct. 2067, 2085 (2019). In relevant part, the American Legion Court reasoned that, with the passage of time,

"religiously expressive monuments, symbols, and practices can become embedded features of a community's landscape and identity," such that the community "may come to value them without necessarily embracing their religious roots." Id. at 2084. In other words, a display of a religious symbol, over time, can "t[ake] on an added secular meaning." Id. at 2089. Long-standing monuments therefore enjoy "a strong presumption of constitutionality." Id. at 2085.

This presumption does not apply, though, to the plaintiffs' proposed religious-flag display. The City has never before displayed such a flag and, as such, this pioneering elevation of an "important symbol" of the Christian heritage would come without the secular context or importance that the passage of time may have afforded other displays. The raising of the Christian Flag thus would threaten to communicate and endorse a purely religious message on behalf of the City. Where that endorsement is as widely visible and accessible as it is here, and where the City could run the risk of repeatedly coordinating the use of government property with hierarchs of all religions, the City's establishment concerns are legitimate. See Lemon v. Kurtzman, 403 U.S. 602, 615 (1971). Accordingly, we conclude that the City's choice to refrain from endorsing a religion through the raising of a religious flag comports with the City's constitutional obligations.

This leaves the plaintiffs' claim that the City's raising of certain flags that incorporate religious imagery while excluding the plaintiffs' Christian Flag constitutes an endorsement of certain religions over others and, thus, works a violation of the Establishment Clause. "[A] flag that references religion by using religious symbols in part of its field is not itself a religious flag." Shurtleff II, 928 F.3d at 177. As the plaintiffs repeatedly emphasize, Rooney does not even look at the flag designs before granting most approvals. And when he reviewed what an applicant described as the "Portuguese Flag," Rooney approved it because it stands for Portugal, the country, and not because it contained certain religious symbols. For aught that appears, Rooney's decision to fly those country/entity flags that include religious imagery was one without a religious dimension. In a logical universe, then, the fact that Rooney elected to let the Flag of Portugal fly is manifestly insufficient to establish that the City is hostile to the plaintiffs' religion.[5]

The short of it is that neutrality toward religion does not obligate the City to fly the Christian Flag on its third flagpole. The City remains neutral where, as here, it wholly refrains from passing judgment on religion. See McCreary, 545

---

[5] For substantially the same reasons, Rooney's decision to allow the hoisting of other flags incidentally containing religious imagery (such as the Turkish flag, the Bunker Hill flag, and the City's own flag) do not evince hostility toward religion.

U.S. at 876. Consequently, we hold that no violation of the Establishment Clause occurred when the City elected not to fly the plaintiffs' Christian Flag.

### D. **The Fourteenth Amendment Claim**.

There is one last stop on our itinerary. The plaintiffs submit that the City's conduct amounts to content-based discrimination against their religious speech and, thus, violates the Equal Protection Clause. The City counters that, because the flagpole is not a public forum and because the plaintiffs' First Amendment claims are futile, their equal protection claim fails as a matter of law.

We pause to brush aside a procedural gambit. The plaintiffs suggest that the City has waived any counter-argument to their equal protection claim. This is magical thinking: the City advanced the very same argument upon which it now relies at summary judgment. No more was exigible to preserve the argument for appellate review. See United States v. Lilly, 13 F.3d 15, 18 (1st Cir. 1994).

Turning to the merits of the claim, we start with the familiar proposition that the Equal Protection Clause demands that "all persons similarly situated should be treated alike." City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985). To establish an equal protection claim, a plaintiff must show that "(1) the person, compared with others similarly situated, was

selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." Davis v. Coakley, 802 F.3d 128, 132-33 (1st Cir. 2015).

What we previously have said — that the City has been engaged in government speech not evocative of First Amendment protections and that the flagpole is not a public forum, see supra Part II (B) — sounds the death knell for the plaintiffs' equal protection claim. The distinguishing feature of the speech cases in which the Supreme Court has found violations of the Equal Protection Clause is the existence of a public forum. See Perry Educ. Ass'n, 460 U.S. at 55; see, e.g., Police Dep't of Chicago v. Mosely, 408 U.S. 92, 96 (1972); Carey v. Brown, 447 U.S. 455, 461 (1980). Conversely, the Court has made nose-on-the-face plain that "on government property that has not been made a public forum, not all speech is equally situated, and the State may draw distinctions which relate to the special purpose for which the property is used." Perry Educ. Ass'n, 460 U.S. at 55. In the absence of a public forum — and we have found none here — the City's practice need only pass rational basis review. See id. Put another way, the practice need only bear a rational relationship to some legitimate governmental purpose. See id. Here, such a purpose is evident in the celebration of Boston's

- 41 -

varied and diverse communities.  Consequently, the plaintiffs' equal protection claim fails.

## III. CONCLUSION

We need go no further.  Like the district court, see Shurtleff III, 2020 WL 555248, at *6, we have taken the measure of the plaintiffs' claims and found them wanting.  Hence, the judgment of the district court is


**Affirmed**.